2004 ME 107

**STATE of Maine**

v.

**Michael TRUSIANI.**

Supreme Judicial Court of Maine.

Submitted On Briefs: March 24, 2004.

Decided: Aug. 13, 2004.

---

Geoffrey A. Rushlau, District Attorney, Patricia A. Mador, Asst. Dist. Atty., Bath, for State.

Matthew B. Nichols, Esq., Nichols & Webb, P.A., Saco, for Defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and LEVY, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, and ALEXANDER, JJ.

Dissent: LEVY, JJ.

ALEXANDER, J.

[¶ 1] Michael Trusiani appeals from a judgment of the Superior Court (Sagadahoc County, *Gorman, J.*) convicting him of one count of aggravated operating under the influence (Class C), 29–A M.R.S.A. § 2411(1)(A), (5)(D) (1996) and one count of operating beyond license restriction (Class E), 29–A M.R.S.A. § 1251(1) (Supp. 2003).[1] The conviction was entered as a result of a conditional guilty plea, M.R.Crim. P. 11(a)(2), allowing Trusiani to appeal the order of the Superior Court (*Crowley, J.*) denying his motion to suppress evidence. Trusiani contends that the suppression court erred in determining that the effects of an initial improper entry into a garage were vitiated by a subsequent consent to enter the home where Trusiani lived, thus allowing use of evidence obtained after the entry into the home. Because the suppression court correctly applied the law to the facts it found, we affirm the judgment.

## I. CASE HISTORY

[¶ 2] On September 27, 2002, the Topsham Police Department received a call from a motorist, who reported that a Ford pickup truck was operating erratically on Interstate 95 and had exited the Interstate proceeding towards Topsham. The description included a license plate number. A Topsham police officer was advised of this information and looked for the described vehicle in the vicinity of the Interstate exit in Topsham. The officer did not see the vehicle in the area. The officer was then advised that the vehicle was registered to Michael Trusiani at an address in Topsham.

[¶ 3] Proceeding towards that address, the officer saw the vehicle stopping at an intersection. The vehicle then made a dangerous turn in front of an approaching vehicle, causing the other vehicle's driver to jam on the brakes to avoid a collision.

---

1. Trusiani's three prior operating under the influence convictions caused the operating under the influence charge to be elevated to a Class C felony. On this charge, Trusiani received a sentence of five years with all but three years and six days suspended and four years of probation plus a $2400 fine, which, with surcharges, totaled $2815.

The officer could not follow the vehicle immediately because he was behind another vehicle turning at the intersection. Exercising appropriate restraint, he did not engage his emergency lights to initiate a pursuit of the vehicle.

[¶ 4] The officer proceeded to the indicated address in Topsham, where he saw the vehicle in the driveway. The vehicle had been out of his sight for no more than two or three minutes. The vehicle was parked in front of the garage that was attached to the house. The garage had a large door for a vehicle, and a smaller door for persons to pass through. There were windows in both the vehicle door and the passage door, through which the interior of the garage was visible. There was no doorbell or other device to signal a request for entry near the garage doors.

[¶ 5] The officer promptly entered the garage through the passage door. There was a dispute between the testimony of the officer and the testimony of Trusiani's mother as to whether the passage door was open or closed. There is no dispute that, after the officer entered the garage, he knocked on the door to the house. Trusiani's mother opened the door and invited the officer into the house. In response to the officer's inquiry as to who had been driving the vehicle, Trusiani's mother advised the officer that Trusiani had been driving the vehicle and that he was presently in the bathroom. Trusiani emerged from the bathroom after a short period and admitted that he had been driving the vehicle. After administration of field sobriety tests, he was arrested for operating under the influence. 29–A M.R.S.A. § 2411(1)(A). There is no dispute that the officer had probable cause to arrest Trusiani for operating under the influence.

[¶ 6] Following his indictment, Trusiani moved to suppress the evidence of the statements and the officer's observations of Trusiani. After a suppression hearing, the court found the facts basically as indicated above. With regard to the conflicting testimony as to whether the passage door to the garage was open or shut, the court determined that the State did not establish that the passage door was open. The court also found that there were no exigent circumstances justifying the officer's entry into the garage.

[¶ 7] Based on those determinations, the court concluded that the officer's warrantless entry into the garage was a constitutional violation and was not otherwise justified and that the evidence obtained as a result of that entry should be suppressed. The court then allowed further argument on the question of whether the suppression order should extend to all of the evidence regarding Trusiani's operating the vehicle while under the influence, or only evidence that may have been obtained as a result of the officer's entry into the garage, before he received consent to enter the house. Ultimately, the court determined that it would not suppress the evidence obtained after the officer's entry into the house, with Trusiani's mother's consent. The court found that: "The consent to enter the kitchen purged the prior illegal entry into the garage." Therefore, the court concluded that all of the evidence sought to be suppressed was legally obtained and denied the motion to suppress.

[¶ 8] After his conditional plea, Trusiani brought this appeal.

## II. LEGAL ANALYSIS

[¶ 9] In determining whether the evidence gained in the house is admissible, we must first determine whether a constitutional violation occurred when the officer entered the garage. On these issues, the trial court's findings of fact are reviewed

deferentially for clear error, while its application of the law to the facts and legal conclusions are reviewed de novo. *State v. Reynoso–Hernandez*, 2003 ME 19, ¶¶ 10–12, 816 A.2d 826, 830; *State v. Forsyth*, 2002 ME 75, ¶ 9, 795 A.2d 66, 69.

[¶ 10] In *Oliver v. United States*, the United States Supreme Court held that the Fourth Amendment protects the curtilage of a house from unreasonable searches and seizures. 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The definition of curtilage was explored in *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), where the Court developed a test for determining what constitutes the curtilage of the home, requiring the consideration of four factors:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.* at 301, 107 S.Ct. 1134.

■ [¶ 11] Using this test, the garage was within the curtilage of Trusiani's mother's home. The garage was attached to the home. It was used for storage, and it housed a working refrigerator and a freezer. Although the garage had windows, the vehicle and passage doors to the garage were closed.[2] Because the garage was within the curtilage of the home, it was protected from unreasonable entries and searches under the Fourth Amendment of the United States Constitution and Article 1, Section 5 of the Maine Constitution.

[¶ 12] This view is supported by several cases where we have found a garage to be a protected area. *See State v. Brochu*, 237 A.2d 418, 421–22 (Me.1967) (holding that a garage that was not attached to the home was "plainly part of the defendant's house in which he was secure against unreasonable searches and seizures"); *Marshall v. Wheeler*, 124 Me. 324, 328, 128 A. 692, 693–94 (1925) (noting that "at common law a shed, connected with the house and used for ... household purposes ... would be considered a part of the dwelling-house, which an officer may not enter by force or against the will of the owner"); *see also Taylor v. United States*, 286 U.S. 1, 5–6, 52 S.Ct. 466, 76 L.Ed. 951 (1932) (finding that a small metal garage adjacent to a dwelling was protected by the Fourth Amendment).

[¶ 13] We examined the law regarding entry into a home in *State v. Crider*, 341 A.2d 1 (Me.1975). In *Crider*, a police officer went to a house to question an individual about an assault. *Id.* at 3. He knocked on an outer door, but no one answered. *Id.* He noticed through the glass in the door that the door opened into an entryway, and the entryway led into a hallway. *Id.* The officer opened the unlocked outer door and proceeded inside to a second closed door. *Id.* He knocked on the second door, and the defendant answered it. *Id.*

[¶ 14] We indicated that the first step in analyzing whether there was a constitutional violation was to examine the "exact functional nature of the so-called hallway

---

**2.** The suppression court indicated that it could not determine whether the passage door was open or closed prior to the officer's entry. Because the State has the burden of proof to demonstrate the reasonableness of a warrantless entry and search, *State v. Rand*, 430 A.2d 808, 817 (Me.1981), the suppression court's finding that the State failed to prove that the door was open requires us to infer that the passage door was closed for purposes of our legal analysis.

in relation to the premises." *Id.* at 4. We held that the officer's "entry into an integral part of a private dwelling, which in the light of the circumstances of this record could not be viewed as reasonably accessible to the public generally, constituted a trespass." *Id.* at 5.

■ [¶ 15] Although the curtilage of the home is protected from unreasonable entries and searches and the dwelling itself may not be entered, absent a warrant or exigent circumstances, the State is allowed to intrude into the home's curtilage under certain circumstances, including accessing the entry to a dwelling while conducting legitimate law enforcement activities.

[¶ 16] In *State v. Cloutier,* 544 A.2d 1277 (Me.1988), a police officer received complaints that a dog was barking in a neighborhood. *Id.* at 1279. While patrolling, he noticed a basement light on in a house that was otherwise dark. *Id.* He walked up to the side door to see if anyone was home, and when no one answered, he glanced into the basement window, where he saw several marijuana plants. *Id.*

[¶ 17] We held that the officer was in the defendant's walkway on legitimate police business, and therefore the defendant's rights were not violated when the officer entered into the house's curtilage. *Id.* The walkway was the "normal route of access for anyone visiting the premises." *Id.* Therefore, the walkway was classified as a semi-private area because there was a "reasonable expectation that various members of society may use the walkway in the course of attending to personal or business pursuits with persons residing in the home, including police officers on police business." *Id.* at 1279–80. Although the police officer had a right to come onto a "walkway or entranceway or porch," that right is not absolute. *Id.* at 1280. "[T]he owner impliedly invites to intrude upon his or her property only those with a legiti-

mate social or business purpose." *Id.* This invitation applies "only to recognized access routes reasonable under the circumstances." *Id.*

[¶ 18] Several other jurisdictions have adopted a similar standard, and have held that when a police officer utilizes the normal route of access to a home, and is conducting legitimate law enforcement activities, the entry is not a violation of the Fourth Amendment. *See State v. Kitchen,* 572 N.W.2d 106, 107, 112 (N.D.1997) (holding that, when police officers knocked on the outer door of a home, and receiving no response, opened the outer door and walked approximately six feet to an inner door, the officers did not violate the Fourth Amendment because the outer door was "impliedly open to at least some access by the public"); *People v. Edelbacher,* 47 Cal.3d 983, 254 Cal.Rptr. 586, 766 P.2d 1, 20 (1989) (finding that, when shoe tracks were visible from the normal route used by visitors when visiting a home, a constitutional violation did not occur); *Doe v. State,* 131 Idaho 851, 965 P.2d 816, 819 (1998) (" 'There is an implied invitation for the public to use access routes to the house, such as parking areas, driveways, sidewalks, or pathways to the entry, and there can be no reasonable expectation of privacy as to observations which can be made from such areas.' " (quoting *State v. Clark,* 124 Idaho 308, 859 P.2d 344, 349 (Ct.App.1993))).

■ [¶ 19] *Cloutier* indicates that, although an officer has a right to enter the curtilage of a house for a legitimate purpose, that right is restricted to areas that are the "normal route of access" for visitors. 544 A.2d at 1279. Here, the testimony indicates that the garage was used as an entryway to the house by the Trusiani family, but was not a "normal route of access" for visitors. Trusiani's mother testified that members of the public came to

the front door when they approached the house, and that the front door was unobstructed when the police officer arrived. This testimony establishes that the garage cannot be classified as a "normal route of access" to the house. The evidence supports the suppression court's finding, to which we defer, that the officer's entry into the garage was a constitutional violation.

[¶ 20] Evidence gained after a constitutional violation must be excluded unless the connection between the evidence and the constitutional violation is "sufficiently weak." *State v. Hunt*, 682 A.2d 690, 692 (Me.1996). A consent may purge the taint of a prior constitutional violation. *State v. Boyington*, 1998 ME 163, ¶ 9, 714 A.2d 141, 144; *State v. McKenzie*, 440 A.2d 1072, 1077 (Me.1982). To address this issue a court must determine " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (*quoting* MAGUIRE, EVIDENCE OF GUILT 221 (1959)).

[¶ 21] In *State v. Boyington*, we applied a five-part test developed by the United States Supreme Court in *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), to determine whether the constitutional violation and evidence subsequently obtained after a consent have a strong enough connection to classify the evidence as "fruit of the poisonous tree." The factors to consider when determining whether such evidence should be suppressed are: (1) the voluntariness of the consent; (2) the proximity in time between the constitutional violation and the discovery of the evidence; (3) whether intervening circumstances were present; (4) the purpose and flagrancy of police misconduct; and (5) whether the police complied with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Boyington*, 1998 ME 163, ¶ 10, 714 A.2d at 144.

[¶ 22] Here, there is no *Miranda* issue. Likewise, there is no serious issue regarding the voluntariness of Trusiani's mother's consent for the officer to enter the home. The trial court found that the consent was valid and voluntary, and that finding was not clearly erroneous. *See State v. Seamen's Club*, 1997 ME 70, ¶ 7, 691 A.2d 1248, 1251 (stating that voluntariness is a question of fact for the trial court to determine, and we review that finding for clear error). The voluntariness of Trusiani's admissions to the officer was not raised, nor does it appear to be an issue.

[¶ 23] The close proximity of the time between the constitutional violation and the discovery of the evidence, and the fact that no intervening circumstances were present, does weigh towards excluding the evidence. *See Brown*, 422 U.S. at 604, 95 S.Ct. 2254 (finding that a statement should be suppressed when that statement was taken less than two hours after an illegal arrest, and no intervening circumstances existed). It is important to note, however, that none of the factors is dispositive. Several courts have stated that the temporal proximity factor is often the least helpful of the criteria. *State v. Shoulderblade*, 905 P.2d 289, 293 (Utah 1995); *State v. Reffitt*, 145 Ariz. 452, 702 P.2d 681, 688 (1985); *People v. Smith*, 258 Ill.App.3d 1003, 196 Ill.Dec. 903, 630 N.E.2d 1068, 1082 (1994).

[¶ 24] In contrast, the purpose and flagrancy of the police misconduct is often characterized as a very important factor when determining whether the evidence should be suppressed. *See United States*

*v. George,* 883 F.2d 1407, 1416 (9th Cir. 1989) (stating that the purpose and flagrancy of police misconduct is the most important factor in the *Brown* test because "it comes closest to satisfying 'the deterrence rationale for application of the exclusionary rule'") (quoting *United States v. Perez–Esparza,* 609 F.2d 1284, 1289 (9th Cir.1979)). When discussing the factors that should be considered when determining whether evidence was tainted by a constitutional violation, the United States Supreme Court listed the factors discussed above, and said, *"particularly,* the purpose and flagrancy of the official misconduct." *Brown,* 422 U.S. at 604, 95 S.Ct. 2254 (emphasis added).

[¶ 25] In *State v. Turner,* 394 A.2d 798 (Me.1978), we stated that "[t]he emphasis that the Supreme Court placed on the fifth factor in *Brown* is entirely consistent with the deterrence rationale of the exclusionary rule." *Id.* at 800. Additionally, in *State v. LeGassey,* we stated that "[a] congenial atmosphere during the detention may compensate for closeness between the [illegal] arrest and the confession." 456 A.2d 366, 368 n. 5 (Me.1983).[3]

[¶ 26] Here, the officer's conduct did not constitute a flagrant disregard of the constitution. *Compare Boyington,* 1998 ME 163, ¶ 12, 714 A.2d at 145 (holding that the evidence should not be suppressed because, although there had been an earlier Fourth Amendment violation, the police officer's actions did not suggest flagrant police misconduct, as evidenced by the fact that their subsequent investigative activities were lawful), *and State v. Bleyl,* 435 A.2d 1349, 1361–62 (Me.1981) (concluding that there was no evidence of flagrant

police misconduct because the police officers arrested the defendants with a good faith belief that the warrants were lawful), *with Brown,* 422 U.S. at 605, 95 S.Ct. 2254 (holding that two police officers acted with a brazen disregard of the constitution because the manner in which they arrested the defendant was apparently "calculated to cause surprise, fright, and confusion").

[¶ 27] The officer was looking for the driver of the truck, and entered the garage because he thought that the driver had entered through the passage door. As soon as he realized that the driver was not in the garage, he went to the interior door. Although access to the interior door through the garage may not have been a normal route of access to the house, the officer could have believed that such access was proper. When Trusiani's mother answered the door, the officer acted in a lawful manner, and did not enter the home until he was invited. Once inside the home, he waited for Trusiani, and did not attempt to gather any evidence until Trusiani exited the bathroom. Although the officer violated Trusiani's constitutional rights by illegally entering the garage, his misconduct was not flagrant, nor did he have an illegal purpose.

[¶ 28] Justice Powell, concurring in *Brown v. Illinois,* noted "the point at which the taint can be said to have dissipated should be related, in the absence of other controlling circumstances, to the nature of that taint." 422 U.S. at 609, 95 S.Ct. 2254. Justice Powell distinguished flagrant abuses from technical violations of the Fourth Amendment and stated that the two types of violations called for "sig-

---

**3.** Despite the fact that the atmosphere is sometimes taken into account, the level of courtesy shown by an officer is not always a factor. In *State v. McKenzie,* 440 A.2d 1072 (Me.1982), we stated that "[a]lthough the offi-

cer was courteous at all times, the defendant was stopped three times within three hours. Courtesy does not dissipate the taint created by an invalid stop." *Id.* at 1077.

nificantly different judicial responses." *Id.* at 610, 95 S.Ct. 2254.

[¶ 29] Because the officer did not act with a flagrant disregard for the constitution, and this factor outweighs the close proximity of the improper entry and the discovery of the evidence, the suppression court could properly determine that the taint of the illegal entry dissipated when the officer received consent to enter from Trusiani's mother. The trial court did not err when it declined to exclude the evidence.

The entry is:

Judgment affirmed.

LEVY, J., dissenting.

[¶ 30] I respectfully dissent.

[¶ 31] Entering an individual's home without a warrant or pursuant to an exception to the warrant requirement is strictly forbidden under the Federal and State Constitutions. For purposes of the Fourth Amendment, no protected setting is "more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). A garage is "plainly part of [a] defendant's house in which he [is] secure against unreasonable searches and seizures under both Federal and State Constitutions." *State v. Brochu,* 237 A.2d 418, 422 (Me.1967). Reasonable law enforcement officers know, or should know, that they can only enter a person's home with a warrant or pursuant to an exception to the warrant requirement.

[¶ 32] The Topsham police officer testified that he made his unannounced and warrantless entry into the garage in order *to find* the driver of the vehicle, whom he thought might be in the garage. This entry into the bounds of a residence through a closed door was clearly purposeful.[4]

[¶ 33] The entry was also a flagrant constitutional violation. Flagrancy is measured by the obviousness of the official's misconduct. *Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (finding that "[t]he impropriety of the arrest was obvious" because "the two detectives ... acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning' "). Even in the absence of bad faith, an obvious constitutional violation is flagrant. *See United States v. Yousif,* 308 F.3d 820, 831 (8th Cir.2002) (finding that despite the absence of bad faith, the officers' search of the defendant's vehicle after the defendant consented to the search "resulted from an exploitation of illegal circumstances," i.e., the illegal vehicular stop).

[¶ 34] Here, the officer did not express any confusion or misunderstanding regarding the applicable constitutional standard, nor was there any basis for a good-faith misunderstanding of the constitutional propriety of entering a private residence through a closed exterior door. When considered from the perspective of established Fourth Amendment principles, the constitutional violation was flagrant.

[¶ 35] The Court suggests that the constitutional violation was not flagrant because "[a]lthough access to the interior door through the garage may not have been a normal route of access to the house, the officer could have believed that such access was proper." The officer testified, however, that he entered the garage to search for a suspected drunk driver, not

---

**4.** *Although there was a dispute in the testimony as to whether the passage door was open or closed, the suppression court concluded* that "I am not satisfied that the status of the garage *door as being opened has been established."*

because he believed or had reason to believe that by entering the garage he could gain access to an internal door providing access to the residential portion of the dwelling. *See United States v. Heath,* 259 F.3d 522, 533–34 (6th Cir.2001) (finding that officers' illegal entry into an apartment building's common hallway undertaken for the purpose of gaining access to defendant's apartment door, where consent to search was obtained, required suppression of the fruits of the search).

[¶ 36] All of the applicable *Brown* and *Boyington* factors weigh in favor of suppression. *See Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254; *State v. Boyington,* 1998 ME 163, ¶ 10, 714 A.2d 141, 144. The officer entered the garage for the purpose of finding Trusiani and without probable cause to search or to arrest, the illegal entry occurred just moments before the officer received consent to enter the kitchen from the garage,[5] and there were no intervening circumstances between the illegal entry and the consent to enter.[6] Trusiani's right to be free from unreasonable government intrusion into his home, a

right that is at " 'the very core" ' of the Fourth Amendment, was violated. *Kyllo v. United States,* 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Id.* The evidence resulting from the intrusion into Trusiani's home should be suppressed.

---

**5.** *See United States v. Cantu,* 230 F.3d 148, 157–58 (5th Cir.2000) (stating that "a brief period of time standing alone is almost enough to vitiate any attenuation claim").

**6.** The consent obtained in this case stands in marked contrast with that considered in *Boyington.* In *Boyington,* the officer arrived at the front door of the defendant's residence approximately four hours after an unlawful stop of the defendant's vehicle. 1998 ME 163, ¶¶ 3–4, 12, 714 A.2d 141, 142, 145. The officer was met at the front door by Boyington's wife. *Id.* ¶ 4, 714 A.2d at 142. The officer then presented her a written consent form authorizing the officer to search the premises, which she signed. *Id.* In this case, the officer entered the kitchen moments after his unlawful entry into the garage. He described his entry into the kitchen from the garage as follows:

  Q. What happened when you knocked on that door?

A. A female came over to the door and opened the door, and she opened the door pretty far, it being late September, and I asked her who was operating the Ford pickup truck.
Q. What did she say?
A. She said my son.
Q. What else or what other conversation did you have with her at that door?
A. I asked her where he was and she said that he was in the bathroom. I can't recall if I asked her to go get him or she just volunteered to go over to get him but she started to head over towards the door to the bathroom area.
Q. What were you doing at this time?
A. I was—I had already stepped into the kitchen area and as she was walking down to the bathroom I shut the door from the kitchen to the garage because it was late September and my mother always told me we are not heating the outdoors so I— so out of courtesy I shut the door.