Majority: SAUFLEY, C.J., and ALEXANDER, LEVY, MEAD, and GORMAN, JJ.
Concurrence: SILVER, J.
Dissent: JABAR, J.
GORMAN, J.
[¶ 1] Richard K. Ntim Jr. appeals from a judgment of conviction entered by the trial court {Lawrence,, J.) upon his conditional guilty plea to one count of unlawful trafficking in a scheduled drug (Class B), 17-A M.R.S. § 1103(1-A)(A) (2012). Ntim contends that the court (Cole, J.) erred in denying his motion to suppress evidence obtained from a search of his person and warrantless administrative inspection of a bus on which he was a passenger. We affirm the judgment.
I. BACKGROUND
[¶ 2] “We view the record in a light most favorable to support the court’s order on the motion to suppress, and find that the record supports the following facts.” State v. Bailey, 2012 ME 55, ¶ 3, 41 A.3d 535. On September 30, 2011, the State Police Commercial Motor Vehicle Unit (Commercial Vehicle Unit), under the supervision of now-Lieutenant Shawn Currie, conducted a planned commercial vehicle inspection of a Greyhound bus, en route from New York to Bangor, at the Greyhound station on St. John Street in Portland. The inspection took place during a regularly scheduled, fifteen- to twenty-minute stop. Lieutenant Currie approached the bus driver and advised him that the State Police would be inspecting the interior and exterior of the bus. Because the inspection included checking the onboard restrooms, Lieutenant Currie asked the driver to request that the passengers get off the bus. The passengers complied.
*372 [¶ 3] The interior inspection of the bus also included a sweep by Angel, a State Police dog under the control of Sergeant Eric Bergquist of the Commercial Vehicle Unit. After Angel “hit” twice on Ntim’s luggage, Lieutenant Currie searched Ntim’s bag but found only some green plant material residue.
[¶4] In addition to troopers from the Commercial Vehicle Unit, agents from the Maine Drug Enforcement Agency, Federal Drug Enforcement Agency, and U.S. Immigration and Customs Enforcement were present at the Greyhound station that morning. Federal Drug Enforcement Agents Paul Wolfe and Joey Brown constituted one of several teams that collectively planned to speak with all of the roughly twenty-five bus passengers during the scheduled stop to find out where each passenger was coming from and going to and whether any unlawful activity was occurring. Agents Wolfe and Brown observed that Ntim appeared very nervous when getting off the bus. After first speaking with a couple from Texas, Agents Wolfe and Brown approached Ntim, identified themselves,[1] obtained some basic information from Ntim, and relayed it to an officer responsible for checking a database containing information about criminal activity. The database check revealed that Ntim was mentioned in an active drug investigation in Bangor, and that the name was a possible alias.
[¶ 5] Sometime after completing the bus inspection, Sergeant Bergquist approached Ntim with Angel. In response to Sergeant Bergquist’s request, Ntim agreed to be sniffed by Angel. Angel indicated twice on Ntim; Sergeant Bergquist questioned the validity of the first indication but was confident as to the second indication, which was up close to Ntim’s crotch. After the dog sniff, Agent Wolfe requested permission from Ntim to search his person and advised Ntim that probable cause existed to obtain a search warrant if he declined. Ntim agreed and went into the restroom at the terminal with Agent Brown and another unspecified agent who searched Ntim and, with his assistance, found about three ounces of cocaine in his underwear.
[¶ 6] The State charged Ntim with one count of unlawful trafficking in a scheduled drug (Class B), 17-A M.R.S. § 1103(1-A)(A), and one count of unlawful possession of a scheduled drug (Class B), 17-A M.R.S. § 1107-A(1)(A)(1) (2012). After a hearing, the court denied Ntim’s motion to suppress any evidence obtained from the search of his person after finding that there was a legitimate reason for having passengers get off the bus during the inspection, law enforcement has the absolute right to ensure that public safety is maintained in a public bus terminal and had done nothing wrong, and Ntim consented to Angel coming in close proximity to his person to check for drugs and to the agents’ search of his person in the restroom. The court, satisfied with Angel’s training and the reliability of the second indication on Ntim, also found that Angel’s indication created an articulable suspicion that gave the agents probable cause to proceed further. Ntim did not file a motion for further findings pursuant to U.C.D.R.P. — Cumberland County 41A(d).
[¶ 7] Ntim conditionally pleaded guilty to one count of unlawful trafficking in a scheduled drug and the State dismissed the count of unlawful possession of a scheduled drug. The court sentenced Ntim to four years in prison with all but eighteen months suspended and a $1,000 fine. Ntim timely appeals the court’s denial of his suppression motion pursuant to 15 *373 M.R.S. § 2115 (2012), U.C.D.R.P. — Cumberland County 11(a)(2), and M.R.App. P. 2(b).
II. DISCUSSION
[¶ 8] Ntim argues that the Commercial Vehicle Unit’s inspection of the bus tainted his consent to the dog sniff and search of his person because it exceeded the Fourth Amendment’s limits on warrantless administrative inspections. The State, on the other hand, contends that (1) law enforcement conducted both the dog sniff and search of Ntim’s person pursuant to his consent rather than as an extension of the bus inspection, (2) Ntim’s consent to each was voluntary, and (3) the dog sniff generated probable cause to proceed with the search of Ntim.
[¶ 9] We review the suppression court’s factual findings “to determine whether those findings are supported by the record, and will only set aside those findings if they are clearly erroneous.” Bailey, 2012 ME 55, ¶ 12, 41 A.3d 535 (quotation marks omitted). We review de novo “a challenge to the application of those facts to constitutional protections.” Id. (quotation marks omitted). “If the ruling on the motion to suppress is based primarily on undisputed facts, it is viewed as a legal conclusion that is reviewed de novo.” Id. (quotation marks omitted).
[¶ 10] Despite Ntim’s argument asking that it link the troopers’ use of a dog as part of their administrative inspection of the bus with the drug enforcement agents’ activities in the terminal, the trial court did not find that there was a link between these activities. The court specifically found that having the passengers get off the bus was appropriate, given the type of inspection the troopers would be conducting. The court also accurately concluded that the drug enforcement agents’ actions in the terminal — attempting to speak with each of the passengers who had exited the bus — were lawful, and that it was the actions that took place inside the terminal that led to the discovery of cocaine on Ntim. Because the court did not find that what happened inside the bus was connected to what happened in the terminal, the court did not analyze the bus inspection to determine whether it fell within the Fourth Amendments exception to the warrant requirement for administrative inspections of pervasively regulated industries, or whether using the drug dog to sweep the bus interior rendered the inspection unlawful.[2] See New York v. Burger, 482 U.S. 691, 702-03, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987); State v. Johnson, 2009 ME 6, ¶ 19, 962 A.2d 973. As noted above, Ntim did not ask the suppression court to make additional find *374 ings to explain further its determination that the use of the dog on the bus was not connected to the dog sniff and subsequent search in the terminal. Because the record is not developed in that regard, we do not analyze the bus inspection here. Rather, we will proceed on the assumption that the administrative inspection violated the Fourth Amendment.[3]
[¶ 11] Given that assumption, we must determine whether the evidence at issue should be excluded as fruit of the prior police illegality or whether it need not be excluded because it is sufficiently attenuated from the inspection. State v. Trusiani, 2004 ME 107, ¶ 20, 854 A.2d 860. Although a consent may purge the taint of a prior police illegality, it is not the only consideration. Bailey, 2012 ME 55, ¶¶ 15-16, 41 A.3d 535. We also assess the voluntariness of the consent, “the temporal proximity” of the prior police illegality and the consent,[4] “the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.”[5] Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (citations omitted); see Bailey, 2012 ME 55, ¶ 15, 41 A.3d 535 (observing that we apply the Brown factors to physical evidence as well as statements made following an illegal arrest). These factors “serve as a means to determine whether, in light of the initial police illegality, the subsequent evidence was obtained by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” Bailey, 2012 ME 55, ¶ 16, 41 A.3d 535 (quotation marks omitted). Our past application of the Brown factors reveals that the weight assigned to each factor varies with each case. Compare Trusiani, 2004 ME 107, ¶¶ 23-29, 854 A.2d 860 (focusing on the absence of flagrant police misconduct in holding that the taint was dissipated despite the temporal proximity and the absence of intervening circumstances), with State v. LeGassey, 456 A.2d 366, 368 (Me.1983) (highlighting the temporal proximity and lack of intervening circumstances in holding that the taint was not dissipated).
*375 [¶ 12] Because the voluntariness of the consent is a threshold factor, see Bailey, 2012 ME 55, ¶ 15, 41 A.3d 535, we begin there by noting that Ntim has not raised any objections to the court’s finding that his consent to the dog sniff was voluntary. As such, and given that all of the court’s findings in that regard are supported by competent record evidence, the court did not err in finding that Ntim voluntarily consented to a dog sniff. See State v. Bailey, 2010 ME 15, ¶ 19, 989 A.2d 716.
[¶ 13] We next turn to the temporal proximity between the bus inspection and Ntim’s consent. As the court found, and as the record shows, those events happened during the fifteen to twenty minutes that the bus was scheduled to stop in Portland. Such close temporal proximity cuts in favor of suppressing the evidence. See Trusiani, 2004 ME 107, ¶¶ 2-4, 23, 854 A.2d 860. Nevertheless, temporal proximity is often regarded as the least helpful of the Brown factors and may be outweighed by the others. Id. ¶ 23; see also LeGassey, 456 A.2d at 368.
[¶ 14] At the heart of this case is the presence of intervening circumstances. We have found that intervening circumstances existed when the additional lawful activities undertaken by an officer produced further information that prompted the officer’s request for consent. See State v. Boyington, 1998 ME 163, ¶¶ 12-13, 714 A.2d 141. If, however, despite an officer’s additional activities, the information prompting the request for consent is solely attributable to the prior illegality, those activities will not help dissipate the taint of that illegality. See State v. McKenzie, 440 A.2d 1072, 1076-77 (Me.1982).
[¶ 15] In Boyington, an officer from the sheriffs department arrested Boying-ton after illegally stopping his vehicle and recovering marijuana plants from the trunk. 1998 ME 163, ¶2, 714 A.2d 141. About two hours later, the sheriffs department, which had advised local police of the arrest, informed local police that Boying-ton was about to call home from jail. Id. ¶ 3. Based on that information, an officer drove to the area and observed Boying-ton’s wife throw what he suspected to be marijuana plants into a pond from an adjacent public road. Id. ¶¶ 3, 13. The officer visually confirmed that the plants were marijuana, proceeded to Boyington’s house, and asked Boyington’s wife for consent to search the premises, which she granted. Id. ¶¶ 3-4. In finding that the officer’s actions constituted intervening circumstances, we reasoned that although the officer went to the road “only after receiving information” generated by a pri- or police illegality, “the officer was positioned legally on that road when he observed [Mrs. Boyington] throwing plants into the pond” and he waited until after visually confirming the nature of the plants to ask for her consent to search. Id. ¶ 13.
[¶ 16] Here, the law enforcement officers in the terminal gained access to Ntim because he entered the bus terminal while the putatively unlawful bus inspection occurred. That notwithstanding, the court found and, contrary to the dissent’s discussion, Ntim did not challenge, that the reason for asking the passengers, to get off the bus — to perform a “level 2” inspection, which includes inspection of the onboard restrooms — was legitimate. See 49 C.F.R. § 374.313(b) (2012) (“Each bus seating more than 14 passengers (not including the driver) shall have a clean, regularly maintained restroom.”). In other words, Ntim would have ended up in the terminal, exposed to law enforcement, regardless of whether or not Angel was brought in to sweep the bus as part of the interior inspection. Additionally, law enforcement *376 officers may wait in a bus terminal open to the public for the purpose of approaching members of the public, requesting identifying information, and seeking consent-based encounters. See Kentucky v. King, - U.S. -, 131 S.Ct. 1849, 1858, 179 L.Ed.2d 865 (2011); United States v. Drayton, 536 U.S. 194, 200-01, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002); Florida v. Bostick, 501 U.S. 429, 434-35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); 1 Wayne R. LaFave, Search and Seizure § 2.4(b) at 817 (5th ed. 2012). Similarly, the presence of a narcotics dog does not, without more, violate the Fourth Amendment. See Illinois v. Caballes, 543 U.S. 405, 409, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Thus, neither the legitimate presence of the officers in the terminal, nor of the narcotics dog, depended on the bus inspection; like the officer waiting on the public road in Boyington, the law enforcement officers here were lawfully present in the Greyhound terminal.
[¶ 17] What transpired after Ntim got off the bus and decided to remain in the terminal was a function of the law enforcement officers’ right to be present in the terminal, handle a drug-sniffing dog, engage bus passengers in consensual conversation, and seek consent-based encounters. As the passengers got off the bus, plain-clothed drug agents observed that Ntim was very nervous and, consistent with their plans to speak with all of the passengers, engaged him in a consensual conversation. Ntim could have declined to speak with the agents, but he did not. Instead, he told them he was travelling to Orono to see a cousin whose last name he could not recall, and provided them with identifying information that revealed prior exposure to drugs and a potential alias.
[¶ 18] Ntim was next approached by Sergeant Bergquist, who had Angel on a leash. Although Sergeant Bergquist and Angel were previously on the bus for part of the inspection, contrary to the dissent’s assertions, there is no evidence in the record that Bergquist approached Ntim because of Angel’s indication during the bus sweep, or because of Lieutenant Currie’s discovery of marijuana residue in Ntim’s bag. Rather, the record supports the inference that Sergeant Bergquist did not know who owned the bag that Angel alerted on. It was Lieutenant Currie, not Sergeant Bergquist, who searched the bag, and it was Lieutenant Currie who testified that he asked the bus driver to identify who had been sitting in that seat, presumably because the bag did not contain any identifying information. Sergeant Bergquist, in contrast, testified that, once finished with the interior sweep of the bus, he intended to walk around the terminal. He altered his plan, however, because he was approached by an agent whose identity he could not recall. That agent asked Sergeant Bergquist if he would take Angel to Ntim, who was already engaged in a conversation with Agent Wolfe, because “we have his name in one of our indexes.” Therefore, the testimony from the handler of the dog will only support an inference that the request to take the dog to Ntim and ask him to consent to a dog sniff was prompted by the information Agents Wolfe and Brown obtained from Ntim. See State v. Connor, 2009 ME 91, ¶ 9, 977 A.2d 1003 (observing that, absent a motion for further findings after a suppression hearing, “we will infer that the court found all the facts necessary to support its judgment if those inferred findings are” supported by the record). Because the separate lawful activities of Agents Wolfe and Brown yielded additional information that resulted in Sergeant Bergquist requesting Ntim’s consent to a dog sniff, those activities constitute an intervening factor. See Boyington, 1998 ME 163, ¶ 13, 714 A.2d 141.
*377 [¶ 19] Finally, we assess the purpose and flagrancy of the police misconduct. Although the assumed purpose of the bus inspection was to find evidence of drugs, we cannot conclude that law enforcement’s misconduct in bringing the dog on to the bus was “a flagrant disregard of the constitution.” Trusiani, 2004 ME 107, ¶ 26, 854 A.2d 860. There is no suggestion in the record that the Commercial Vehicle Unit did not actually conduct an inspection of the bus, just that it may have gone too far, and the Fourth Amendment does not prohibit law enforcement from having a drug dog present for the inspection or otherwise at the terminal. Further, the activities of the law enforcement officers inside the terminal, engaging in consensual encounters, were lawful. As for the search of Ntim’s bag by Lieutenant Cur-rie, although it was not constitutionally permitted, it is unclear from the record whether it rises to the level of flagrant misconduct.[6] That the officer’s sole purpose in searching the bag ostensibly was to follow up on the dog’s indication that the bag contained drugs weighs in favor of characterizing the misconduct as flagrant. See Brown, 422 U.S. at 605, 95 S.Ct. 2254. Because there is no evidence in the record that Lieutenant Currie exploited the violation in any way, however, the violation does not undermine the attenuating effect of the intervening circumstances, even if we assume that the misconduct was flagrant.
[¶ 20] Although the bus inspection and Ntim’s consent to the dog sniff were in close temporal proximity, we conclude that Ntim’s voluntary consent to the dog sniff was sufficiently attenuated from the bus inspection due to the intervening activities of the law enforcement personnel present in the terminal. Additionally, as the court found, Angel’s second alert on Ntim constituted sufficient probable cause for the agents to proceed with the search of Ntim’s person in the restroom. See Florida v. Harris, — U.S. -, 133 S.Ct. 1050, 1056 n. 2, 1057, 185 L.Ed.2d 61 (2013). Thus, even if the police ran afoul of the Fourth Amendment while conducting the warrantless administrative inspection of the bus, the court did not err in denying Ntim’s motion to suppress.
The entry is:
Judgment affirmed.

. The agents were dressed in plain clothes and their guns were not visible.

. To be considered reasonable pursuant to the Fourth Amendment, New York v. Burger requires that a warrantless administrative inspection of a pervasively regulated industry meet the following criteria: (1) "there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made”; (2) it "must be necessary to further [the] regulatory scheme”; and (3) "the statute’s inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.” 482 U.S. 691, 702-03, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (alterations in original) (quotation marks omitted). We have analyzed and found constitutional, in the context of commercial trucking, the statutory and regulatory scheme pursuant to which designated agents conduct warrantless administrative inspections of commercial motor vehicles. See State v. Melvin, 2008 ME 118, ¶¶ 10-12, 955 A.2d 245. Designated agents also derive their authority to inspect buses from the same Federal Motor Carrier Safety Regulations evaluated in Melvin but additional regulations apply. 29-A M.R.S. § 555 (2012); 49 C.F.R. Ch. III, Subch. B (2012); see, e.g., 49 C.F.R § 374.313(b) (2012) (requiring buses to have clean, functional restrooms on board).

.In addition to our already-stated assumption that the entire bus inspection violated the Fourth Amendment, see City of Indianapolis v. Edmond, 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (stating that an administrative search without particularized suspicion of criminal conduct may be permitted, provided that the search is appropriately limited to its administrative purpose), it does appear that Lieutenant Currie’s search of Ntim’s bag on the bus was also not Constitutionally permissible. Although the dog’s alert at Ntim’s seat generated the probable cause necessary to seize the bag on the seat, the Fourth Amendment does not permit law enforcement to search the bag without a warrant. See Florida v. Harris,- U.S. -, 133 S.Ct. 1050, 1057, 185 L.Ed.2d 61 (2013); United States v. Place, 462 U.S. 696, 701-02, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (noting that if law enforcement has probable cause to believe that a personal effect located in a public place contains contraband, the officers may seize the property "pending issuance of a warrant to examine its contents”).

. Given that Brown v. Illinois dealt with an illegal arrest and the resulting confession, it actually describes the temporal factor as measuring the time lapsed between "the arrest and the confession.” 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Here, we are evaluating the effect that an illegal bus inspection has on the admissibility of physical evidence subsequently recovered from a passenger and therefore consider the time lapsed between the illegal inspection and the defendant’s consent. See State v. Boyington, 1998 ME 163, ¶ 12, 714 A.2d 141.

. Brown also identifies police compliance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as an additional factor. Brown, 422 U.S. at 603, 95 S.Ct. 2254. Here, there is no Miranda issue as Ntim consented to the dog sniff prior to his arrest. See, e.g., State v. Trusiani, 2004 ME 107, ¶ 22, 854 A.2d 860; Boyington, 1998 ME 163, ¶ 11 & n. 2, 714 A.2d 141.

. Lieutenant Currie’s violation could result in a suppression of the contents of Ntim’s bag, but no charges were brought against Ntim based on the information obtained from the bag.