MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2013 ME 80
Docket:        Cum-12-289
Argued:        January 15, 2013
Decided:       September 17, 2013

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and
               JABAR, JJ.
Majority:      SAUFLEY, C.J., and ALEXANDER, LEVY, MEAD, and GORMAN, JJ.
Concurrence:   SILVER, JJ.
Dissent:       JABAR, JJ.

STATE OF MAINE

v.

RICHARD K. NTIM JR.

GORMAN, J.

[¶1]  Richard K. Ntim Jr. appeals from a judgment of conviction entered by the trial court (*Lawrence, J.*) upon his conditional guilty plea to one count of unlawful trafficking in a scheduled drug (Class B), 17-A M.R.S. § 1103(1-A)(A) (2012).  Ntim contends that the court (*Cole, J.*) erred in denying his motion to suppress evidence obtained from a search of his person and warrantless administrative inspection of a bus on which he was a passenger.  We affirm the judgment.

I.  BACKGROUND

[¶2]  "We view the record in a light most favorable to support the court's order on the motion to suppress, and find that the record supports the following

2

facts." *State v. Bailey*, 2012 ME 55, ¶ 3, 41 A.3d 535. On September 30, 2011, the State Police Commercial Motor Vehicle Unit (Commercial Vehicle Unit), under the supervision of now-Lieutenant Shawn Currie, conducted a planned commercial vehicle inspection of a Greyhound bus, en route from New York to Bangor, at the Greyhound station on St. John Street in Portland. The inspection took place during a regularly scheduled, fifteen- to twenty-minute stop. Lieutenant Currie approached the bus driver and advised him that the State Police would be inspecting the interior and exterior of the bus. Because the inspection included checking the onboard restrooms, Lieutenant Currie asked the driver to request that the passengers get off the bus. The passengers complied.

[¶3] The interior inspection of the bus also included a sweep by Angel, a State Police dog under the control of Sergeant Eric Bergquist of the Commercial Vehicle Unit. After Angel "hit" twice on Ntim's luggage, Lieutenant Currie searched Ntim's bag but found only some green plant material residue.

[¶4] In addition to troopers from the Commercial Vehicle Unit, agents from the Maine Drug Enforcement Agency, Federal Drug Enforcement Agency, and U.S. Immigration and Customs Enforcement were present at the Greyhound station that morning. Federal Drug Enforcement Agents Paul Wolfe and Joey Brown constituted one of several teams that collectively planned to speak with all of the roughly twenty-five bus passengers during the scheduled stop to find out where

each passenger was coming from and going to and whether any unlawful activity was occurring. Agents Wolfe and Brown observed that Ntim appeared very nervous when getting off the bus. After first speaking with a couple from Texas, Agents Wolfe and Brown approached Ntim, identified themselves,[1] obtained some basic information from Ntim, and relayed it to an officer responsible for checking a database containing information about criminal activity. The database check revealed that Ntim was mentioned in an active drug investigation in Bangor, and that the name was a possible alias.

[¶5] Sometime after completing the bus inspection, Sergeant Bergquist approached Ntim with Angel. In response to Sergeant Bergquist's request, Ntim agreed to be sniffed by Angel. Angel indicated twice on Ntim; Sergeant Bergquist questioned the validity of the first indication but was confident as to the second indication, which was up close to Ntim's crotch. After the dog sniff, Agent Wolfe requested permission from Ntim to search his person and advised Ntim that probable cause existed to obtain a search warrant if he declined. Ntim agreed and went into the restroom at the terminal with Agent Brown and another unspecified agent who searched Ntim and, with his assistance, found about three ounces of cocaine in his underwear.

---

[1] The agents were dressed in plain clothes and their guns were not visible.

4

[¶6]   The State charged Ntim with one count of unlawful trafficking in a scheduled drug (Class B), 17-A M.R.S. § 1103(1-A)(A), and one count of unlawful possession of a scheduled drug (Class B), 17-A M.R.S. § 1107-A(1)(A)(1) (2012). After a hearing, the court denied Ntim's motion to suppress any evidence obtained from the search of his person after finding that there was a legitimate reason for having passengers get off the bus during the inspection, law enforcement has the absolute right to ensure that public safety is maintained in a public bus terminal and had done nothing wrong, and Ntim consented to Angel coming in close proximity to his person to check for drugs and to the agents' search of his person in the restroom.  The court, satisfied with Angel's training and the reliability of the second indication on Ntim, also found that Angel's indication created an articulable suspicion that gave the agents probable cause to proceed further.  Ntim did not file a motion for further findings pursuant to U.C.D.R.P.–Cumberland County 41A(d).

[¶7]   Ntim conditionally pleaded guilty to one count of unlawful trafficking in a scheduled drug and the State dismissed the count of unlawful possession of a scheduled drug.  The court sentenced Ntim to four years in prison with all but eighteen months suspended and a $1,000 fine.  Ntim timely appeals the court's denial of his suppression motion pursuant to 15 M.R.S. § 2115 (2012), U.C.D.R.P.–Cumberland County 11(a)(2), and M.R. App. P. 2(b).

## II.  DISCUSSION

[¶8]  Ntim argues that the Commercial Vehicle Unit's inspection of the bus tainted his consent to the dog sniff and search of his person because it exceeded the Fourth Amendment's limits on warrantless administrative inspections.  The State, on the other hand, contends that (1) law enforcement conducted both the dog sniff and search of Ntim's person pursuant to his consent rather than as an extension of the bus inspection, (2) Ntim's consent to each was voluntary, and (3) the dog sniff generated probable cause to proceed with the search of Ntim.

[¶9]  We review the suppression court's factual findings "to determine whether those findings are supported by the record, and will only set aside those findings if they are clearly erroneous."  *Bailey*, 2012 ME 55, ¶ 12, 41 A.3d 535 (quotation marks omitted).  We review de novo "a challenge to the application of those facts to constitutional protections."  *Id.*  (quotation marks omitted).  "If the ruling on the motion to suppress is based primarily on undisputed facts, it is viewed as a legal conclusion that is reviewed de novo."  *Id.* (quotation marks omitted).

[¶10]  Despite Ntim's argument asking that it link the troopers' use of a dog as part of their administrative inspection of the bus with the drug enforcement agents' activities in the terminal, the trial court did not find that there was a link between these activities.  The court specifically found that having the passengers

6

get off the bus was appropriate, given the type of inspection the troopers would be conducting. The court also accurately concluded that the drug enforcement agents' actions in the terminal—attempting to speak with each of the passengers who had exited the bus—were lawful, and that it was the actions that took place inside the terminal that led to the discovery of cocaine on Ntim. Because the court did not find that what happened inside the bus was connected to what happened in the terminal, the court did not analyze the bus inspection to determine whether it fell within the Fourth Amendment's exception to the warrant requirement for administrative inspections of pervasively regulated industries, or whether using the drug dog to sweep the bus interior rendered the inspection unlawful.[2] *See New York v. Burger*, 482 U.S. 691, 702-03 (1987); *State v. Johnson*, 2009 ME 6, ¶ 19, 962 A.2d 973. As noted above, Ntim did not ask the suppression court to make additional findings to explain further its determination that the use of the dog on the bus was not connected to the dog sniff and subsequent search in the terminal.

---

[2] To be considered reasonable pursuant to the Fourth Amendment, *New York v. Burger* requires that a warrantless administrative inspection of a pervasively regulated industry meet the following criteria: (1) "there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) it "must be necessary to further [the] regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." 482 U.S. 691, 702-03 (1987) (alterations in original) (quotation marks omitted). We have analyzed and found constitutional, in the context of commercial trucking, the statutory and regulatory scheme pursuant to which designated agents conduct warrantless administrative inspections of commercial motor vehicles. *See State v. Melvin*, 2008 ME 118, ¶¶ 10-12, 955 A.2d 245. Designated agents also derive their authority to inspect buses from the same Federal Motor Carrier Safety Regulations evaluated in *Melvin* but additional regulations apply. 29-A M.R.S. § 555 (2012); 49 C.F.R. Ch. III, Subch. B (2012); *see, e.g.*, 49 C.F.R. § 374.313(b) (2012) (requiring buses to have clean, functional restrooms on board).

Because the record is not developed in that regard, we do not analyze the bus inspection here. Rather, we will proceed on the assumption that the administrative inspection violated the Fourth Amendment.[3]

[¶11] Given that assumption, we must determine whether the evidence at issue should be excluded as fruit of the prior police illegality or whether it need not be excluded because it is sufficiently attenuated from the inspection. *State v. Trusiani*, 2004 ME 107, ¶ 20, 854 A.2d 860. Although a consent may purge the taint of a prior police illegality, it is not the only consideration. *Bailey*, 2012 ME 55, ¶¶ 15-16, 41 A.3d 535. We also assess the voluntariness of the consent, "the temporal proximity" of the prior police illegality and the consent,[4] "the presence of intervening circumstances, and, particularly, the purpose and

---

[3] In addition to our already-stated assumption that the entire bus inspection violated the Fourth Amendment, *see City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (stating that an administrative search without particularized suspicion of criminal conduct may be permitted, provided that the search is appropriately limited to its administrative purpose), it does appear that Lieutenant Currie's search of Ntim's bag on the bus was also not Constitutionally permissible. Although the dog's alert at Ntim's seat generated the probable cause necessary to seize the bag on the seat, the Fourth Amendment does not permit law enforcement to search the bag without a warrant. *See Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013); *United States v. Place*, 462 U.S. 696, 701-02 (1983) (noting that if law enforcement has probable cause to believe that a personal effect located in a public place contains contraband, the officers may seize the property "pending issuance of a warrant to examine its contents").

[4] Given that *Brown v. Illinois* dealt with an illegal arrest and the resulting confession, it actually describes the temporal factor as measuring the time lapsed between "the arrest and the confession." 422 U.S. 590, 603 (1975). Here, we are evaluating the effect that an illegal bus inspection has on the admissibility of physical evidence subsequently recovered from a passenger and therefore consider the time lapsed between the illegal inspection and the defendant's consent. *See State v. Boyington*, 1998 ME 163, ¶ 12, 714 A.2d 141.

flagrancy of the official misconduct."[5]  *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) (citations omitted); *see Bailey*, 2012 ME 55, ¶ 15, 41 A.3d 535 (observing that we apply the *Brown* factors to physical evidence as well as statements made following an illegal arrest).  These factors "serve as a means to determine whether, in light of the initial police illegality, the subsequent evidence was obtained by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Bailey*, 2012 ME 55, ¶ 16, 41 A.3d 535 (quotation marks omitted).  Our past application of the *Brown* factors reveals that the weight assigned to each factor varies with each case.  *Compare Trusiani*, 2004 ME 107, ¶¶ 23-29, 854 A.2d 860 (focusing on the absence of flagrant police misconduct in holding that the taint was dissipated despite the temporal proximity and the absence of intervening circumstances), *with State v. LeGassey*, 456 A.2d 366, 368 (Me. 1983) (highlighting the temporal proximity and lack of intervening circumstances in holding that the taint was not dissipated).

[¶12]  Because the voluntariness of the consent is a threshold factor, *see Bailey*, 2012 ME 55, ¶ 15, 41 A.3d 535, we begin there by noting that Ntim has not raised any objections to the court's finding that his consent to the dog sniff was

---

[5]  *Brown* also identifies police compliance with *Miranda v. Arizona*, 384 U.S. 436 (1966), as an additional factor.  *Brown*, 422 U.S. at 603.  Here, there is no *Miranda* issue as Ntim consented to the dog sniff prior to his arrest.  *See, e.g., State v. Trusiani*, 2004 ME 107, ¶ 22, 854 A.2d 860; *Boyington*, 1998 ME 163, ¶ 11 & n.2, 714 A.2d 141.

voluntary. As such, and given that all of the court's findings in that regard are supported by competent record evidence, the court did not err in finding that Ntim voluntarily consented to a dog sniff. *See State v. Bailey*, 2010 ME 15, ¶ 19, 989 A.2d 716.

[¶13] We next turn to the temporal proximity between the bus inspection and Ntim's consent. As the court found, and as the record shows, those events happened during the fifteen to twenty minutes that the bus was scheduled to stop in Portland. Such close temporal proximity cuts in favor of suppressing the evidence. *See Trusiani*, 2004 ME 107, ¶¶ 2-4, 23, 854 A.2d 860. Nevertheless, temporal proximity is often regarded as the least helpful of the *Brown* factors and may be outweighed by the others. *Id.* ¶ 23; *see also LeGassey*, 456 A.2d at 368.

[¶14] At the heart of this case is the presence of intervening circumstances. We have found that intervening circumstances existed when the additional lawful activities undertaken by an officer produced further information that prompted the officer's request for consent. *See State v. Boyington*, 1998 ME 163, ¶¶ 12-13, 714 A.2d 141. If, however, despite an officer's additional activities, the information prompting the request for consent is solely attributable to the prior illegality, those activities will not help dissipate the taint of that illegality. *See State v. McKenzie*, 440 A.2d 1072, 1076-77 (Me. 1982).

10

[¶15]   In *Boyington,* an officer from the sheriff's department arrested Boyington after illegally stopping his vehicle and recovering marijuana plants from the trunk.  1998 ME 163, ¶ 2, 714 A.2d 141.  About two hours later, the sheriff's department, which had advised local police of the arrest, informed local police that Boyington was about to call home from jail.  *Id.* ¶ 3.  Based on that information, an officer drove to the area and observed Boyington's wife throw what he suspected to be marijuana plants into a pond from an adjacent public road.  *Id.* ¶¶ 3, 13.  The officer visually confirmed that the plants were marijuana, proceeded to Boyington's house, and asked Boyington's wife for consent to search the premises, which she granted.  *Id.* ¶¶ 3-4.  In finding that the officer's actions constituted intervening circumstances, we reasoned that although the officer went to the road "only after receiving information" generated by a prior police illegality, "the officer was positioned legally on that road when he observed [Mrs. Boyington] throwing plants into the pond" and he waited until after visually confirming the nature of the plants to ask for her consent to search.  *Id.* ¶ 13.

[¶16]   Here, the law enforcement officers in the terminal gained access to Ntim because he entered the bus terminal while the putatively unlawful bus inspection occurred.  That notwithstanding, the court found and, contrary to the dissent's discussion, Ntim did not challenge, that the reason for asking the passengers to get off the bus—to perform a "level 2" inspection, which includes

inspection of the onboard restrooms—was legitimate. *See* 49 C.F.R. § 374.313(b) (2012) ("Each bus seating more than 14 passengers (not including the driver) shall have a clean, regularly maintained restroom."). In other words, Ntim would have ended up in the terminal, exposed to law enforcement, regardless of whether or not Angel was brought in to sweep the bus as part of the interior inspection. Additionally, law enforcement officers may wait in a bus terminal open to the public for the purpose of approaching members of the public, requesting identifying information, and seeking consent-based encounters. *See Kentucky v. King*, 131 S. Ct. 1849, 1858 (2011); *United States v. Drayton*, 536 U.S. 194, 200-01 (2002)*; Florida v. Bostick*, 501 U.S. 429, 434-35 (1991); 1 Wayne R. LaFave, *Search and Seizure* § 2.4(b) at 817 (5th ed. 2012). Similarly, the presence of a narcotics dog does not, without more, violate the Fourth Amendment. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005). Thus, neither the legitimate presence of the officers in the terminal, nor of the narcotics dog, depended on the bus inspection; like the officer waiting on the public road in *Boyington*, the law enforcement officers here were lawfully present in the Greyhound terminal.

[¶17] What transpired after Ntim got off the bus and decided to remain in the terminal was a function of the law enforcement officers' right to be present in the terminal, handle a drug-sniffing dog, engage bus passengers in consensual conversation, and seek consent-based encounters. As the passengers got off the

bus, plain-clothed drug agents observed that Ntim was very nervous and, consistent with their plans to speak with all of the passengers, engaged him in a consensual conversation. Ntim could have declined to speak with the agents, but he did not. Instead, he told them he was travelling to Orono to see a cousin whose last name he could not recall, and provided them with identifying information that revealed prior exposure to drugs and a potential alias.

[¶18] Ntim was next approached by Sergeant Bergquist, who had Angel on a leash. Although Sergeant Bergquist and Angel were previously on the bus for part of the inspection, contrary to the dissent's assertions, there is no evidence in the record that Bergquist approached Ntim because of Angel's indication during the bus sweep, or because of Lieutenant Currie's discovery of marijuana residue in Ntim's bag. Rather, the record supports the inference that Sergeant Bergquist did not know who owned the bag that Angel alerted on. It was Lieutenant Currie, not Sergeant Bergquist, who searched the bag, and it was Lieutenant Currie who testified that he asked the bus driver to identify who had been sitting in that seat, presumably because the bag did not contain any identifying information. Sergeant Bergquist, in contrast, testified that, once finished with the interior sweep of the bus, he intended to walk around the terminal. He altered his plan, however, because he was approached by an agent whose identity he could not recall. That agent asked Sergeant Bergquist if he would take Angel to Ntim, who was already

engaged in a conversation with Agent Wolfe, because "we have his name in one of our indexes." Therefore, the testimony from the handler of the dog will only support an inference that the request to take the dog to Ntim and ask him to consent to a dog sniff was prompted by the information Agents Wolfe and Brown obtained from Ntim. *See State v. Connor*, 2009 ME 91, ¶ 9, 977 A.2d 1003 (observing that, absent a motion for further findings after a suppression hearing, "we will infer that the court found all the facts necessary to support its judgment if those inferred findings are" supported by the record). Because the separate lawful activities of Agents Wolfe and Brown yielded additional information that resulted in Sergeant Bergquist requesting Ntim's consent to a dog sniff, those activities constitute an intervening factor. *See Boyington*, 1998 ME 163, ¶ 13, 714 A.2d 141.

[¶19] Finally, we assess the purpose and flagrancy of the police misconduct. Although the assumed purpose of the bus inspection was to find evidence of drugs, we cannot conclude that law enforcement's misconduct in bringing the dog on to the bus was "a flagrant disregard of the constitution." *Trusiani*, 2004 ME 107, ¶ 26, 854 A.2d 860. There is no suggestion in the record that the Commercial Vehicle Unit did not actually conduct an inspection of the bus, just that it may have gone too far, and the Fourth Amendment does not prohibit law enforcement from having a drug dog present for the inspection or otherwise at the terminal. Further, the activities of the law enforcement officers inside the terminal, engaging in

14

consensual encounters, were lawful. As for the search of Ntim's bag by Lieutenant Currie, although it was not constitutionally permitted, it is unclear from the record whether it rises to the level of flagrant misconduct.[6] That the officer's sole purpose in searching the bag ostensibly was to follow up on the dog's indication that the bag contained drugs weighs in favor of characterizing the misconduct as flagrant. *See Brown*, 422 U.S. at 605. Because there is no evidence in the record that Lieutenant Currie exploited the violation in any way, however, the violation does not undermine the attenuating effect of the intervening circumstances, even if we assume that the misconduct was flagrant.

[¶20] Although the bus inspection and Ntim's consent to the dog sniff were in close temporal proximity, we conclude that Ntim's voluntary consent to the dog sniff was sufficiently attenuated from the bus inspection due to the intervening activities of the law enforcement personnel present in the terminal. Additionally, as the court found, Angel's second alert on Ntim constituted sufficient probable cause for the agents to proceed with the search of Ntim's person in the restroom. *See Florida v. Harris*, 133 S. Ct. 1050, 1056 n.2, 1057 (2013). Thus, even if the police ran afoul of the Fourth Amendment while conducting the warrantless

---

[6] Lieutenant Currie's violation could result in a suppression of the contents of Ntim's bag, but no charges were brought against Ntim based on the information obtained from the bag.

administrative inspection of the bus, the court did not err in denying Ntim's motion to suppress.

The entry is:

Judgment affirmed.

---

SILVER, J., concurring.

[¶21] I concur in the Court's opinion, but write separately to emphasize the dangers of multi-agency search and interdiction projects like this one. Here, the facts as found by the motion court support denial of Ntim's motion to suppress. Nevertheless, the use of drug-sniffing dogs to conduct ostensibly routine administrative safety inspections of commercial passenger buses is a practice that should be seriously questioned.

[¶22] The record reveals that the State Police Commercial Vehicle Unit routinely uses a drug-sniffing dog as part of its safety inspections. The propriety of this practice is questionable at best. Although dog sniffs are not searches per se,[7] the element of deception inherent in this practice is cause for concern. As Lieutenant Currie testified, passengers are instructed to leave their luggage behind

---

[7] Exposing luggage found in a public place to a trained drug-sniffing dog does not constitute a search for purposes of the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 707 (1983). However, when police officers bring a dog onto the front porch of a home, the physical intrusion into the constitutionally protected curtilage is enough to establish that a search occurred. *Florida v. Jardines*, 133 S.Ct. 1409, 1417-18 (2013).

when they exit the bus for the safety inspection. This is very likely an illegal seizure of passengers' property. This is not a situation where passengers are free to withhold consent to subject their personal property to an encounter with law enforcement.[8] Passengers are essentially tricked into leaving the bus. They believe they are leaving for a routine safety inspection, most likely without the expectation that a police dog will be given unlimited access to their personal effects. Although there is no expectation of privacy in the odor of illegal drugs emanating from one's person or belongings, *see Illinois v. Caballes*, 543 U.S. 405, 409 (2005); *United States v. Place,* 462 U.S. 696, 707 (1983), the inability of passengers to control or participate in the police encounter—or to even know that it is taking place—is troublesome. As a result, this scenario does not fit comfortably within existing Fourth Amendment jurisprudence relating to bus searches. *See generally Florida v. Bostick*, 501 U.S. 429 (1991) (holding that the practice of seeking bus passengers' consent to search is not inherently coercive); *United States v. Drayton*, 536 U.S. 194 (2002) (holding that the Fourth Amendment does not require officers who request bus passengers' consent to inform passengers of their right to withhold consent).

---

[8] In the context of drug interdiction efforts conducted on buses, the U.S. Supreme Court has explained that, in determining whether police conduct is sufficiently coercive that an attempt to seek a consensual encounter rises to the level of a seizure within the meaning of the Fourth Amendment, the proper inquiry is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991).

[¶23]   As the Court acknowledges in footnote 3 of its opinion, Lieutenant Currie committed a Fourth Amendment violation when he searched Ntim's bag. The dog's alert may have generated probable cause to believe that the bag contained contraband, but Currie was not justified in immediately opening it.  The State hinted in its brief that exigent circumstances may have permitted Currie's warrantless search of the bag, but did not fully develop this argument.  It is difficult to see what exigent circumstances would have prevented Currie from temporarily detaining the bag in order to seek either consent or a search warrant. *See Place*, 462 U.S. at 702; *United States v. Jacobsen*, 466 U.S. 109, 121-122 (1984).  The State did not argue that the "automobile exception" to the Fourth Amendment's general warrant requirement applies in this case.  *See, e.g., California v. Acevedo*, 500 U.S. 565 (1982).  That argument would likely have been unsuccessful as well.  Automobiles present a unique situation because of their inherent mobility.  Here, there is no indication that Ntim, as a passenger, could have easily made off with the bus and the potential evidence it contained, especially in light of the fact that he was inside the terminal when the dog alerted and police took control of the bag.

[¶24]   The State only prevails in this case because, based on the lower court's findings, we cannot infer a causal link between this serious violation and Ntim's consent to the search of his person, which ultimately revealed the drugs he

later sought to suppress. Agent Wolfe testified that he confronted Ntim and "outlined some of the evidence that indicated that there was a likelihood that he might be carrying illegal drugs." Presumably, this would include the fact that the dog had alerted on his luggage, and that they had already found traces of a leafy green substance—presumably marijuana—inside his bag. If this were indeed the case, Ntim's consent to the search is almost certainly tainted by this exploitation of the illegal search. However, our review must be limited to the facts as found by the motion court. The factual basis to draw such a conclusion is simply lacking from the motion court's findings.

[¶25] Ironically, the various law enforcement agencies involved in this case could have skipped the safety routine, which appears to have been nothing more than a pretext for conducting drug interdiction, given the presence of both state and federal drug enforcement agents. If they had simply brought the drug-sniffing dog into the terminal, this would not even be a close case. *See, e.g., Caballes,* 543 U.S. at 409 (concluding that the use of a trained drug-sniffing dog does not implicate legitimate privacy interests); *Place,* 462 U.S. at 707 (holding that a dog sniff of luggage left in a public place is not a search within the meaning of the Fourth Amendment). Law enforcement officers are free to approach citizens to seek consensual interactions. *Florida v. Royer,* 460 U.S. 491, 497 (1983). None of the actions law enforcement took inside the terminal amounted to constitutional

violations. The fact that law enforcement agents could have achieved the same result without threatening passengers' Fourth Amendment rights counsels in favor of a reassessment of the efficacy and utility of this practice.

[¶26] However inadvisable this tactic may be, here the motion court did not find a connection between the illegal search that took place on the bus and Ntim's voluntary consent to a search in the terminal restroom. For that reason alone, I agree that the court did not err in denying Ntim's motion to suppress.

———————————

JABAR, J., dissenting.

[¶27] I respectfully dissent because the joint operation of the Commercial Motor Vehicle Unit of the Maine State Police (Commercial Vehicle Unit) and the Drug Enforcement Agency (DEA) had the primary purpose of interdicting drugs. This joint operation exploited the Commercial Vehicle Unit's authority to conduct safety inspections as a pretext to detect ordinary criminal activity.

[¶28] The suspicionless sweep of buses in interstate travel is a common police tactic in the "war on drugs" known as "working the buses."[9] Generally, the tactic involves law enforcement officers boarding interstate buses at stopovers, identifying themselves, announcing their purpose to locate drug traffickers, and

———————————

[9] The term "working the buses" was used by the Florida Supreme Court and later by the United States Supreme Court in *Florida v. Bostick*. *See Florida v. Bostick*, 501 U.S. 429, 433 (1991); *Bostick v. State*, 554 So.2d 1153, 1156 (Fla. 1989) *overruled by Bostick*, 501 U.S. at 440.

requesting consent to search passengers' belongings without any prior suspicion of criminal wrongdoing. *See Florida v. Bostick*, 501 U.S. 429, 440-42 (1991) (Marshall, J., dissenting). The *Bostick* Court held that the police are permitted to conduct these searches without a warrant pursuant to the passengers' consent, if the "officers do not convey a message that compliance with their requests is required." *Id.* at 437 (majority opinion). Following the *Bostick* decision, there has been substantial academic criticism of this law enforcement technique. *See, e.g.*, Tracey Maclin*, Justice Thurgood Marshall: Taking the Fourth Amendment Seriously*, 77 Cornell L. Rev. 723, 800-01 (1992); Christian J. Rowley, Florida v. Bostick*: The Fourth Amendment—Another Casualty of the War on Drugs*, 1992 Utah L. Rev. 601, 626-45; Shawn V. Lewis, *Fourth Amendment—Protection Against Unreasonable Seizures of the Person: the Intrusiveness of Dragnet Styled Drug Sweeps*, 82 J. Crim. L. & Criminology 797, 797-98, 816 (1992).

[¶29] Notwithstanding the controversy surrounding the law enforcement tactic at issue in this case, unlike the facts in *Bostick*, here we have the added role of a pretextual safety inspection. *Cf. Bostick*, 501 U.S. at 431-32. If the DEA agents were working independently of the Commercial Vehicle Unit and had merely engaged Ntim in "consensual conversation[s]" in the terminal, *see* Court's Opinion ¶ 17, then *Florida v. Bostick* would control this case, and I would agree with the Court's decision to affirm. *See* Court's Opinion ¶¶ 18, 20. However, we

cannot ignore the cooperation and coordination between the Commercial Vehicle Unit and DEA agents in this joint operation. DEA Agent Wolf said it best when he testified that "[it was] a planned operation to work with the Maine State Police [Commercial Vehicle Unit]. They were conducting safety inspections on buses, and we had an existing relationship with them *through which those safety inspections offered an opportunity for us to work on interdiction*." (Emphasis added.) Because the investigating officers sought Ntim's consent for a search only after they confronted him with evidence gathered in an unlawful search of his luggage, this case crosses the line drawn by the *Bostick* Court. *See* 501 U.S. at 437.

A.    Safety Inspection

[¶30]   Although the Court assumes that the bus inspection was unlawful, believing that the record was undeveloped in that regard, Court's Opinion ¶ 10, I provide a full analysis of the bus inspection because it is necessary for a clear understanding of the connection between the actions of the DEA agents and officers of the Commercial Vehicle Unit.

1.    Special Needs Requirement

[¶31]   In order to conduct suspicionless and warrantless inspections, the Fourth Amendment clearly requires the police to demonstrate that they have a special law enforcement need, *distinct from a "general interest in crime control*."

*See City of Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000) (emphasis added and quotation marks omitted); *State v. Johnson*, 2009 ME 6, ¶¶ 14-16, 962 A.2d 973. This special law enforcement need ensures that police are not simply circumventing the Fourth Amendment requirements in ordinary criminal investigations and "prevent[s] arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *See United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976); *see also Edmond*, 531 U.S. at 41; *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665-68 (1989). For example, the Supreme Court has held that the police may conduct special needs investigations where the public interest outweighs the degree of intrusion on the individual's Fourth Amendment interest—specifically for the detection of drunk drivers, *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 455 (1990), and illegal aliens, *Martinez-Fuerte*, 428 U.S. at 566.

[¶32] In *City of Indianapolis v. Edmond*, the U.S. Supreme Court addressed a similar inspection using a drug-sniffing dog conducted for the sole purpose of detecting illegal narcotics. 531 U.S. at 35, 40-41. The Government argued that the use of the drug dog was a limited intrusion on the individual's Fourth Amendment privacy interests as weighed against the public's substantial interest in curbing narcotics trafficking. *Id.* at 42-43. The *Edmond* Court rejected this argument and held that the checkpoint was unconstitutional solely based on the program's

primary purpose—detecting ordinary criminal activity. *Id.* at 43-44 ("We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint *primarily for the ordinary enterprise of investigating crimes.*" (emphasis added)). In *Edmond*, the Court did not focus on the limited intrusion of the drug dog, but viewed the use of a drug dog as evidence of the primary purpose of the inspection—detecting illegal narcotics. *Id.*

[¶33] Similarly, an administrative safety inspection may not be conducted primarily for detecting ordinary criminal activity. "In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations." *New York v. Burger*, 482 U.S. 691, 724 (1987) (Brennan, J., dissenting) (citing, *inter alia, Michigan v. Clifford,* 464 U.S. 287, 292 (1984); *Michigan v. Tyler,* 436 U.S. 499, 508 (1978); *Donovan v. Dewey*, 452 U.S. 594, 598 n. 6 (1981); *Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523, 539 (1967)); *see also Abel v. United States,* 362 U.S. 217, 226 (1960) ("The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts."). To determine whether the safety inspection was conducted to detect ordinary criminal activity, we examine the intent of the investigating officers.

2.      Intent of the Investigating Officers

[¶34]    Generally, safety inspections of commercial motor vehicles in interstate travel are permitted without a warrant or prior suspicion. *See State v. Melvin*, 2008 ME 118, ¶ 7, 955 A.2d 245.  However, to determine whether the primary purpose of a purported administrative safety inspection is actually for general criminal investigation, we examine the subjective intent of the investigating officers.  *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080-81 (2011). Although we have observed in some Fourth Amendment cases that the subjective intentions of individual officers are irrelevant, *see State v. Cilley*, 1998 ME 34, ¶ 7, 707 A.2d 79, searches conducted for administrative purposes or pursuant to a special law enforcement need are longstanding exceptions to that rule. *See al-Kidd*, 131 S. Ct. at 2080 ("Fourth Amendment reasonableness is predominately an objective inquiry . . . . Two limited exceptions to this rule are our special-needs and administrative-search cases, where actual motivations do matter." (quotation marks and alterations omitted)).

[¶35]  An inspection is pretextual when investigating officers use their legal authority to conduct administrative inspections in order to gain access to persons or places absent a warrant or prior suspicion in order to conduct ordinary law enforcement investigations.  *See Whren v. United States*, 517 U.S. 806, 811 (1996) (quoting *Burger*, 482 U.S. at 716-17 & n.27); *cf. Johnson*, 2009 ME 6, ¶¶ 14-16,

962 A.2d 973. When the officers conduct a pretextual administrative inspection, their actions are "invalid *ab initio* and our analysis . . . end[s] there." *See Johnson*, 2009 ME 6, ¶¶ 14-16, 962 A.2d 973.

[¶36] Here, the pretext is obvious—the officers of both the Commercial Vehicle Unit and the DEA actually intended to conduct a joint investigation to detect the trafficking of illegal narcotics. The Commercial Vehicle Unit conducted the safety inspection and the lead investigator of that unit clarified the intent of the operation at the suppression hearing:

> Defense: Okay. You just indicated that there was an exterior walk around, looking at the lights—(indiscernible). And the [canine] what—what—what is the [canine] intended to detect on the bus when you're doing an inspection?
>
> Lieutenant Currie: Drugs.
>
> Defense: For a safety inspection?
>
> Lieutenant Currie: Yes.
>
> Defense: Okay. So that is part of the primary objective then?
>
> Lieutenant Currie: Well, it's an additional portion of it. It's part of our job to inspect commercial vehicles *and to interdict crime.*

(Emphasis added.) Further, the drug dog handler in the Commercial Vehicle Unit testified:

> Sergeant Bergquist: There's part of any commercial inspection under the federal regulations is [*sic*] to check for the presence of drugs or

alcohol. There's also a history of large amounts of narcotics being transported under the disguise of commercial commerce.

Prosecution: So if you were doing any commercial motor vehicle check, you would use your dog?

Sergeant Bergquist: Correct.

[¶37] Although the regulations prohibit *drivers* from possessing narcotics or other substances "which render[] the driver incapable of safely operating a motor vehicle," 49 C.F.R. § 392.4(a) (2012), they contain no provision authorizing the inspection of passengers or their personal belongings for drugs. *See generally* 29-A M.R.S. § 555(2) (2012) (permitting the adoption of the Federal Motor Carrier Safety Regulations); *V-1 Oil Co. v. Means*, 94 F.3d 1420, 1427 (10th Cir. 1996) ("The [motor carrier safety] regulations make it clear the inspections are limited in scope to safety concerns. They do not authorize a general search by any law enforcement officer." (citation omitted)).

[¶38] When the officers of the Commercial Vehicle Unit stepped foot on the bus under the guise of a safety inspection with the clear intention to look for drugs, they violated the Fourth Amendment. *See, e.g., al-Kidd*, 131 S. Ct. at 2080-81; *Whren*, 517 U.S. at 811-12. The Commercial Vehicle Unit's use of a drug dog is evidence of their intent not to conduct a safety inspection, but to interdict drugs. Further, the officers clearly testified that they conducted the inspection for the purpose of inspecting passengers' luggage for drugs, which compels me to

conclude that the primary purpose was a general interest in crime control, and thus the inspection violates the Fourth Amendment.

B.    DEA Actions

[¶39]   Further, the evidence in the record compels me to conclude that the Fourth Amendment violation was not simply confined to the bus inspection but also extends to the actions of the DEA agents for three reasons.

[¶40]   First, based on Ntim's failure to move the suppression court for additional findings of fact or conclusions of law, the Court infers that the trial court found that Ntim's consent was the result of a separate lawful investigation and was thus attenuated from the illegal bus inspection. *See* Court's Opinion ¶¶ 10 & n.3, 18.  "[W]e will infer that the court found all the facts necessary to support its judgment if those inferred findings are supportable by evidence in the record." *State v. Connor*, 2009 ME 91, ¶ 9, 977 A.2d 1003; *see generally* U.C.D.R.P.-Cumberland County 41A(d); M.R. Crim. P. 41A(d).  However, as the Court noted, the trial court never addressed the issue of whether the bus inspection was lawful, Court's Opinion ¶ 10 & n.3, and thus it had no reason to determine whether Ntim's consent was attenuated from that illegality.  *See State v. Boyington*, 1998 ME 163, ¶ 9, 714 A.2d 141.  *But see* Court's Opinion ¶ 10 & n.3 (noting that "[t]he [trial] court also accurately concluded that the drug enforcement agents' actions in the terminal . . . led to the discovery of cocaine on Ntim").  Thus, the

Court in this case infers a finding to support a conclusion that the trial court never made—that Ntim's consent was attenuated from the fruits of an illegal bus inspection.

[¶41]  Rather, during the suppression hearing, the trial court stated that the police "[we]re checking to make sure as to who's coming into the state, *and they have an absolute right to do that under these circumstances*."  (Emphasis added.)  Because the trial court would have had no reason to engage in an attenuation analysis pursuant to *State v. Boyington*, 1998 ME 163, ¶ 9, 714 A.2d 141, any inference that the trial court might have considered whether Ntim's consent was a result of the bus inspection or of separate investigative activities by DEA agents is wholly invented on appeal.

[¶42]  Second, the evidence in the record does not support the Court's inference that the drug dog handler approached Ntim due to the separate, lawful investigative activities of the DEA agents.  *See Connor*, 2009 ME 91, ¶ 9, 977 A.2d 1003 (stating that we will infer that the trial court made findings if those findings are "supportable by evidence in the record").  DEA Agents Wolfe and Brown both testified that they did not request the drug dog handler to approach Ntim with the drug dog.  Agent Wolfe testified, "I did not, specifically, say 'I'm interviewing this person now[, c]ome examine them,' no.  *It happened without my prompting*."  (Emphasis added.)  Similarly, Agent Brown stated that he did not

know if someone requested Sergeant Bergquist to bring the dog to Ntim and that he "did not hear anybody specifically [request it]."

[¶43] Sergeant Bergquist, the Commercial Vehicle Unit's drug dog handler, testified that it was "not a normal part of an inspection of a bus" to lead the dog through the terminal, but that he led the dog into the terminal in this case as "a follow up to the [drug dog's] indication [on luggage] inside the bus." However, before he could begin his follow-up inspection in the terminal, Bergquist testified that one of the DEA agents requested him to lead the dog to Ntim.[10] The trial court did not specifically find that the DEA agent's request for a sniff of Ntim was unrelated to the bus inspection. Instead, the trial court found that "[t]he state police dog comes off the bus, after having hit twice in regard to the Defendant's luggage, [where] they found some green plant material residue. And he comes out and he . . . inquired if it was [alright] if he could go ahead and bring the dog [to sniff Ntim]."

[¶44] Regardless of whether the Commercial Vehicle Unit's drug-dog handler approached Ntim due to the bus inspection or the DEA agents' investigation, it is undisputed that the DEA agents confronted Ntim with the

---

[10] Although the drug dog handler did not indicate that he knew the agent who requested a sniff of Ntim was from the DEA, he stated that the officer was in plain clothes—which DEA agents wore on the morning of Ntim's arrest—and that the officer had found Ntim's name "in one of [their] indexes." The DEA agents testified that they had in fact located Ntim's name as a person of interest in their Narcotics and Dangerous Drugs Information System.

evidence produced by the drug dog before they requested his consent to a search of his person. DEA Agent Wolfe stated to Ntim, "Look, here's what we have. Here's *all the things that are indicating* and making me suspicious." (Emphasis added.) Agent Wolfe, who "requested" Ntim's consent, testified that he informed Ntim

> Here's what's going to happen for the next while. I'm concerned that you have drugs right now. And in order to do my job of trying to keep drugs out of the community, what may happen next is we may move forward and detain you. We can seek a search warrant. We can do a lot of things, and it might mean that you'd have to go later on. Or if [you are] not carrying anything, and you tell me that you're not carrying anything, we can be done with this very quickly, if you'll just let us make sure that you don't have anything on you.

Agent Brown corroborated this testimony, stating, "Special Agent Wolfe had presented what had arisen thus far *with the dog*[, and t]hen he had asked him if he would consent to a search of his person." Although Agent Wolfe requested Ntim's consent for a search, he noted, "[Ntim] wasn't free to go based on everything that I knew." This is not the result of an independent investigation by DEA agents conducting a "consensual conversation." *But see* Court's Opinion ¶ 17. The notion that DEA agents coordinating a joint operation and maintaining constant communication with the Commercial Vehicle Unit—who had inspected the bus and had only moments before found incriminating evidence in a bag belonging to Ntim—approached Ntim due to a wholly separate, simultaneous investigation is simply not supported by the evidence in this record.

[¶45] Third, the Court determines that the actions of the DEA agents were separate from the Commercial Vehicle Unit because it concludes that Ntim would have "ended up in the terminal, exposed to law enforcement, regardless of whether or not Angel was brought in to sweep the bus." Court's Opinion ¶ 16. The Court defers to the trial court's finding that inspection of the onboard restrooms was a legitimate reason to ask passengers to exit the bus. However, the trial court's factual finding is not supported by any competent evidence in the record, and it is therefore clearly erroneous. *See State v. Bartlett*, 661 A.2d 1107, 1108 (Me. 1995).

[¶46] The regulation governing the inspection of onboard restrooms reads: "Each bus (except in commuter service) seating more than 14 passengers (not including the driver) shall have a clean, regularly maintained restroom, free of offensive odor. A bus may be operated without a restroom if it makes reasonable rest stops." 49 C.F.R. § 374.313(b) (2012). Common sense dictates that it is unnecessary to have the twenty-five passengers aboard the bus vacate the bus in order for an officer to ensure that the restroom is clean and odor free. *See id.* There is no further evidence in the record that removing passengers from the bus was necessary to carry out this kind of inspection of the restroom.

[¶47] Rather, Sergeant Bergquist, the drug dog handler, testified that passengers were asked to exit the bus so that he could "[take] Angel off of her lead and let her have free reign [*sic*] of the bus." Most compelling, however, is the

testimony of DEA Agent Paul Wolfe, who testified that the Commercial Vehicle Unit and the DEA agents planned to target "a specific bus" traveling from New York City to Portland for a safety inspection and that DEA agents would approach the passengers who exited that bus. DEA Agent Wolfe further testified that both the Commercial Vehicle Unit and the DEA jointly formed an "initial plan in the morning . . . to examine bags"—a plan that could only be carried out if passengers exited the bus, left their luggage on board, and gave the drug dog free access to the bags. Further, Lieutenant Currie testified that before he conducted the safety inspection, he told the driver to instruct the passengers to leave their bags onboard and exit the bus. Therefore, the trial court's finding that inspection of the restrooms was a "legitimate reason" to ask passengers to exit the bus is clearly erroneous. *See State v. Bailey*, 2012 ME 55, ¶ 12, 41 A.2d 535; *Bartlett*, 661 A.2d at 1108 (setting out the clearly erroneous standard of review).

[¶48] In sum, although the trial court failed to consider the relationship between the actions of the Commercial Vehicle Unit and the actions of the DEA agents in the terminal, the evidence in the record compels both a finding and a conclusion that their actions were connected. I agree with the Court's assertion that if the DEA agents were working independently of the Commercial Vehicle Unit, then *Florida v. Bostick* applies and the DEA agents are allowed to question passengers in the terminal just as they would be on the bus. *See* 501 U.S. at

435-37. But the facts are dramatically different in this case because the actions of the DEA agents and the Commercial Vehicle Unit in this joint operation were planned and coordinated. Agent Wolfe testified that the safety inspections generally "offered [the DEA agents] an opportunity . . . to work on interdiction," and that the "initial plan in the morning . . . was to examine bags." Agent Wolfe elaborated that the DEA agents and the Commercial Vehicle Unit worked "in concert" regularly, they had "done this several times . . . [in] Portland, Lewiston, Augusta, a variety of places."

[¶49] Both the Commercial Vehicle Unit and the DEA planned to have all of the passengers, including Ntim, removed from the bus, leaving their luggage onboard, so that the Commercial Vehicle Unit's drug dog could examine their luggage and the DEA agents could question them in the terminal. DEA agents requested Ntim's consent only *after* the Commercial Vehicle Unit brought their drug dog to sniff his person—which was only moments after the Commercial Vehicle Unit located trace evidence of drugs in Ntim's bag. They confronted Ntim with this evidence before "requesting" his consent.

C. Conclusion

[¶50] Given this overwhelming evidence on the level of communication and coordination between these two agencies, any implicit finding that the encounter in the terminal was unrelated to the bus inspection is clearly erroneous. The

uncontroverted evidence in this case compels a conclusion that the officers of the Commercial Vehicle Unit and the DEA agents jointly planned the encounter and coordinated their actions to allow DEA Agents to question the passengers whom the inspecting officers removed from the bus, and that the DEA agents confronted Ntim with the fruits of the unlawful bus inspection. I would vacate the judgment denying Ntim's motion to suppress the evidence gathered in the search of his person.

---

**On the briefs:**

> Anthony J. Sineni, III, Esq., Law Offices of Anthony J. Sineni, III, LLC, Portland, for appellant Richard Ntim

> William J. Schneider, Attorney General, and William R. Savage, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

> Caleb J. Gannon, Esq., Law Offices of Anthony J. Sineni, III, LLC, for appellant Richard Ntim

> William R. Savage, Asst. Atty. Gen., for appellee State of Maine

Cumberland County Unified Criminal Docket number CR-2011-6591

FOR CLERK REFERENCE ONLY