STATE of Maine

v.

Miles Benjamin THOMPSON.

Supreme Judicial Court of Maine.

Argued Nov. 26, 1985.

Decided Jan. 3, 1986.

Paul Aranson, Dist. Atty., Laurence Gardner (orally), Asst. Dist. Atty., Portland, for plaintiff.

Childs, Emerson, Rundlett, Fifield & Childs, Richard S. Emerson, Jr. (orally), Portland, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

After a jury trial the Superior Court (Cumberland County) convicted defendant Miles Benjamin Thompson of three counts of gross sexual misconduct, 17–A M.R.S.A. § 253(1)(B), a Class A crime; one count of incest, 17–A M.R.S.A. § 556, a Class D crime; and one count of sexual abuse of a minor, 17–A M.R.S.A. § 254, a Class D crime. All five charges resulted from a

continuous sexual relationship to which defendant Thompson had subjected his minor daughter, commencing in 1978 when she was eleven years of age. The daughter gave birth to a child in May 1982. In addition to extensive testimony from the victim about defendant's regular sexual intercourse with her over a period of about five years to the exclusion of any other male until after the birth of that child, the State presented the results of blood tests that in the opinion of the State's expert witness indicated that defendant had fathered the daughter's child to a 99.46% probability. As his sole ground for appeal, defendant attacks the admission of that evidence, arguing that the chain of custody of the blood samples involved in the testing was not adequately established and that the State's expert based his opinion on tests and analyses relied upon only for the purpose of litigation. We find no error in the Superior Court's admission of that opinion evidence, and accordingly we affirm Thompson's convictions.

The State obtained a court order in June 1984 compelling defendant to allow a sample of his blood to be drawn for paternity testing. The victim and her child also submitted to the blood sampling procedure. The samples were drawn by a technician of Roche Biomedical Laboratories, Inc., who labeled each specimen with the drawee's name, thumbprint, and photograph, signed a chain-of-custody certificate, and mailed it with the specimens to the Roche laboratory in Burlington, North Carolina. When the samples arrived at the Roche Laboratory, a medical technician, according to a strict recordkeeping procedure, removed the samples, examined the package to ensure that they had not been tampered with or substituted, and completed and signed the chain-of-custody certificate. Roche laboratory technicians then performed a battery of tests on the blood samples. Because of

blood grouping similarities among defendant, the victim and her child, Dr. G.L. Ryals, associate director of Roche's Department of Paternity Evaluation and the State's expert witness at trial, directed that second samples be drawn in November 1984. On those second samples, the human leukocyte antigen (HLA) tissue-typing test was repeated and yielded identical results, and additional tests were performed involving an analysis of red cell enzymes and serum proteins. In all, 16 independent systems were studied. Since not one of these 16 independent tests excluded defendant as the father, Dr. Ryals testified to his opinion that there is a 99.46% probability that defendant begot his minor daughter's child.[1]

## I.

At trial defendant objected to the adequacy of the authentication of the blood specimens tested at the Roche laboratory. He complained that since none of the Roche technicians from North Carolina was present, he could not test the authenticity of the specimens by cross-examination. The presiding justice overruled the objection and held that the documents shipped with and used to identify the blood samples were sufficient to authenticate the specimens for the purpose of Dr. Ryals' testimony. The documents, admitted under the business records exception to the hearsay rule, M.R.Evid. 803(6), included the chain-of-custody certificates and recorded the identity, shipping, receipt, and condition of the specimens prior to testing at the Roche laboratory. On appeal, defendant does not challenge admission of those foundational documents pursuant to the business records exception. Instead, he contends that they failed to establish a sufficient chain of custody to guarantee the integrity of the blood specimens on which Dr. Ryals ultimately based his opinion as to the probabilities of the child's paternity.

1. In his report of the blood test results, admitted in evidence as State's Exhibit # 1, Dr. Ryals concluded: "The alleged father, Benjamin Thompson, and the child, [name omitted], share common genetic markers. Using the HLA system, along with ABO[,] Rh, MNSs, Kell, Duffy, Kidd, PGM1, AcP, Gc, EsD, Hp, Bf, PLG, GM, and PI[,] the probability of paternity is 99.46%, as compared to the random unrelated North American Caucasian population."

The foundational showing required of the State for admission of the paternity test results is prescribed by M.R.Evid. 901(a), which provides with general applicability:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

The rule casts questions of the identity or authenticity of evidence in terms of conditional relevancy. M.R.Evid. 901 advisors' note, *reprinted in* Field & Murray, *Maine Evidence* 245 (1976). "This requirement of showing authenticity or identity falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b)." Fed.R.Evid. 901 advisory committee note. Evidence must be shown to be genuine before it is admissible. 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 901(a)[01], at 901-15 (1985).

Because blood specimens lack distinctive identifying characteristics, the State in the case at bar relied on proving a chain of custody in order to establish the authenticity of the blood specimens. *See generally* 29 Am.Jur.2d *Evidence* § 775 (1967). Chain of custody evidence merely provides one way of satisfying the basic requirements of Rule 901. Proof by that method does not impose any new or extraordinary conditions upon the admission of evidence. *See State v. Nason,* 498 A.2d 252, 256 (Me.1985). Like other methods of authentication, "[t]he chain of custody ... serve[s] a dual purpose. It is an aid to the court in determining the admissibility of the evidence and it may also act as an aid to the finder of facts in determining what weight is to be given the evidence once admitted." *State v. Thibodeau,* 353 A.2d 595, 603 (Me. 1976). The law does not demand that the proponent of evidence demonstrate the chain of custody so overwhelmingly "as to eliminate all possibility of tampering with the exhibit involved." *Id.* On the contrary, "[f]or admission purposes, it suffices if the custodial evidence establishes by the fair preponderance of the evidence rule that it is more probable than not that the object is the one connected with the case." *Id.; see also State v. Desjardins,* 401 A.2d 165, 171 (Me.1979).

■ In the present case the State met the threshold requirement for admissibility under M.R.Evid. 901(a) by adducing custodial evidence in the form of detailed documents. Once those documents surmounted the hearsay hurdle, they were admitted to prove the truth of the matter asserted, namely, that the blood samples drawn from the Thompsons were the same samples tested at the Roche laboratory to determine the probability of the child's paternity. *See United States v. Duhart,* 496 F.2d 941 (9th Cir.), *cert. denied,* 419 U.S. 967, 95 S.Ct. 230, 42 L.Ed.2d 182 (1974) (chain of custody of vaginal smear in rape case established by use of federal statutory business records exception). *See also* E. Cleary, *McCormick on Evidence* § 212, at 668 n. 28 (3d ed. 1984) ("The various business records [hearsay exception] statutes ... have proved of great utility in securing admission of regularly marked and labeled specimens"). *See generally* Annot., 19 A.L.R.3d 1008, 1021-25 (1968). Nothing in Rule 901 obligated the State to parade every individual who handled the blood specimens onto the witness stand to testify subject to cross-examination. On the contrary, "[a]ny lack of further [evidence] as to the chain of custody properly went to the weight, and not to the admissibility" of testimony based on the paternity testing of those samples. *State v. Pickering,* 491 A.2d 560, 562-63 (Me.1985).

■ Defendant also complains that the chain of custody testimony, presented out of the presence of the jury on the *voir dire* of Dr. Ryals, was not repeated in full before the jury. He asserts that the jury accordingly had an insufficient basis for assessing the reliability of the blood tests that Dr. Ryals relied upon. The quick and complete answer is that at trial defendant never made any objection, under M.R.Evid.

705(b) or otherwise, to Dr. Ryals' testifying before the jury without a complete repetition of his *voir dire* testimony. Defendant had an unrestricted opportunity before the jury to cross-examine the State's expert to expose any shortcomings that he might claim to exist in the chain of custody shown by the documentary exhibits. The presiding justice correctly charged the jury that it was to treat an expert witness's testimony like any other testimony, and that it was free to believe all of that testimony, some part of it, or none at all of it. In the circumstances of this trial the presiding justice committed no error, let alone the obvious error required for reversal by M.R. Crim.P. 52(b), in permitting Dr. Ryals to testify before the jury to his expert opinion based on the blood tests performed by his laboratory on what purported to be the Thompson blood samples.

## II.

■ Defendant finally contends that Dr. Ryals' opinion testimony failed to meet the requirement for the admission of such testimony by an expert set forth in M.R.Evid. 703 [2] because it relied on blood tests and on statistical analysis performed solely for the purpose of this present litigation. We find no merit in this contention. Once the trial justice determines that an expert is qualified to render an opinion relevant to the pending proceeding, "the opinion of [the] expert is admissible if it is based on a proper factual foundation." *State v. Ifill,* 349 A.2d 176, 183 (Me.1975). Even though the facts or data relied upon by the expert are not themselves admissible in evidence, the proponent of the expert's testimony satisfies the requirement of a proper factual foundation if he shows that they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." M.R.Evid.

703; *see also State v. Rolls,* 389 A.2d 824, 829–30 (Me.1978).

Of course Dr. Ryals performed the Thompson blood tests at his laboratory, and then relied upon the results, solely for the purpose of preparing to testify in the present criminal prosecution. Nonetheless, under Evidence Rule 703 Dr. Ryals' opinion testimony is still admissible if the blood tests and statistical method used by him would be reasonably relied upon by experts in his field. We believe there can be no doubt on that score here. Once the State qualified Dr. Ryals as an expert and established the authenticity of the blood specimens, it then demonstrated the reliability of the underlying data and statistical method upon which Dr. Ryals based his expert opinion. The blood testing technique employed by the Roche technicians under Dr. Ryals' direct supervision is widely accepted in the scientific community as an accurate method of determining paternity probabilities. *See Little v. Streater,* 452 U.S. 1, 6–8, 101 S.Ct. 2202, 2205–06, 68 L.Ed.2d 627 (1980). *See generally* R. Walker, ed., *Inclusion Probabilities in Parentage Testing* (1983); H. Silver, ed., *Paternity Testing* (1978); Lee, *Current Status of Paternity Testing,* 9 Family Law Quarterly 615 (1975). The American Medical Association and the Section on Family Law of the American Bar Association have jointly endorsed the use of blood test results in paternity disputes, including use for estimating the likelihood of paternity. *Joint AMA–ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Family Law Quarterly 247 (1976). Maine, along with five other states, has enacted the Uniform Act on Paternity, promulgated by the National Conference of Commissioners on Uniform State Laws in 1960. 19 M.R.S.A. §§ 271–287 (1981); 9A U.L.A. 329 (Supp.1985). Section 10 of that uniform act expressly

---

**2.** M.R.Evid. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type

reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

authorizes courts in civil proceedings thereunder to admit expert testimony, based on blood test results, offered to prove or disprove paternity.[3] The Uniform Parentage Act, promulgated by the Commissioners in 1973 and now adopted in 15 states, provides in section 12 that "[e]vidence relating to paternity may include ... blood test results, weighted in accordance with evidence, if available, of the statistical probability of the alleged father's paternity...." *See* 9A U.L.A. "Uniform Parentage Act" § 12, at 602 (1979); 9A U.L.A. 307 (Supp. 1985). *See also Commissioners' Comment to § 12,* 9A U.L.A. 602–04 (1979).

Paternity testing depends upon the existence of genetic markers that reflect personal characteristics inherited by a child from his biologic parents. Lee, *Paternity Testing,* 9 Family Law Quarterly, at 616. Certain genetic markers are readily identifiable by blood tests. *Id.* To arrive at a paternity probability value, a succession of independent tests is performed, each examining a different blood system and comparing a different set of genetic markers. *See, e.g., AMA–ABA Guidelines,* 10 Family Law Quarterly, at 257–58.

One simple but mathematically valid estimation of the likelihood of paternity is that when extended testing providing a very high probability of exclusion fails to exclude an accused man there is a high probability that he is in fact the father. *Id.* at 260. Estimates of the likelihood of paternity involves a statistical calculation. Test results, studying the constellation of genetic markers carried in the blood of the child, the known mother, and the putative father, are compared with the genetic profile of the general population in order to determine the probability that a randomly selected male would not have the necessary genetic markers to have fathered the child.

*Id.* at 260–63. The base data for that statistical comparison are contained in gene frequency tables, which record the frequency in the relevant general population of a specific genetic marker being studied. *Id.* at 263–76. Dr. Ryals testified that the frequency tables, prepared by the American Association of Blood Banks, upon which he relied to calculate the paternity probability in this case are generally accepted and used by the scientific community. A wealth of scientific literature and case law support that testimony. *See* Hummel, "Selection of Gene Frequency Tables," *Inclusion Probabilities in Parentage Testing* 231 (R. Walker, ed. 1983); *AMA–ABA Guidelines,* 10 Family Law Quarterly 247 (and references therein); Lee, *Paternity Testing,* 9 Family Law Quarterly 615; Annot., 37 A.L.R.4th 167 (1985).

Thus Dr. Ryals formed his expert opinion of paternity probabilities, not on the basis of facts and statistical analyses unique to him and to this litigation; rather he followed a course of investigation well-charted and well-accepted in both the scientific and the legal communities. Even if paternity evaluation as performed by Dr. Ryals had no use other than in court, it has arrived at such a stage of general acceptance scientifically and legally that the requirement of Evidence Rule 703 is satisfied; the facts and analyses relied upon by Dr. Ryals *are* "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." It is true that *State v. Rolls,* 389 A.2d at 830, quoted with approval the following unqualified statement from Field & Murray, *Maine Evidence* § 703.2, at 175: "Nor is it enough to show that [the expert witness] relies upon such material only in preparing for litigation; he must establish

---

3. 19 M.R.S.A. § 280 (1981) (§ 10 of Uniform Act on Paternity) provides:

If the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence. If the experts conclude that the blood tests show the probability of the alleged father's paternity, admission of this evidence is within the discretion of the court, depending upon the infrequency of the blood type.

that experts would act upon it for purposes other than testifying in a lawsuit." That bald statement, however, should be modified where facts and analyses are widely accepted as proper to rely upon in forming an expert opinion—even though only in preparing for litigation. *See Mannino v. International Mfg. Co.*, 650 F.2d 846, 851–53 (6th Cir.1981). *See generally* E. Cleary, *McCormick on Evidence* § 207 (3d ed. 1984); K. Graham, *Federal Evidence* § 703.2 (1981). In any event, experts *do* rely for out-of-court purposes upon facts and analyses similar to those used by Dr. Ryals in forming his opinion. Physicians rely upon such blood tests in diagnosing and treating disease. Dr. Ryals testified, for example, that the HLA test, performed on both sets of the Thompson blood samples, is also used to establish tissue compatibility for organ transplants and diagnosis of ankylosing spondylitis, a crippling arthritis of the spine. Race and Sanger report that paternity testing itself of the general type pursued by Dr. Ryals is used in the course of biological research; "[f]or example, in the working out of the inheritance of a 'new' antigen it is important to avoid being misled by information from extra-marital children." *See* R. Race & R. Sanger, *Blood Groups in Man* 497 (6th ed. 1975).

To summarize, not only did Dr. Ryals establish the professional reliance accorded to this kind of blood testing and statistical comparison in general, but he also testified at length about the particular procedure and the reliability of the 16 specific tests on which he based his expert opinion. The

State amply established the admissibility of the expert opinion that Dr. Ryals formed as a result of his analyzing the results of the Thompsons' blood tests performed in his laboratory, in light of generally accepted gene frequency tables.[4] The presiding justice acted well within the scope of his discretion in permitting Dr. Ryals to state to the jury his professional opinion as to the degree of probability that defendant was the father of his own daughter's child.

The entry is: Judgments of conviction affirmed.

All concurring.

---

4. Concern has been justifiably expressed as to possible misuse and misunderstanding of expert testimony of paternity probabilities because of the appearance of scientific infallibility and mathematical precision. Broun & Krause, "Paternity Blood Tests and the Courts," *Inclusion Probabilities in Parentage Testing* 171, 174–79 (R. Walker ed. 1983); *Joint AMA–ABA Guidelines* 10 Family Law Quarterly at 263. *See also* E. Cleary, *McCormick on Evidence* § 211, at 661 (3d ed. 1984); Ellman & Kaye, *Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?*, 54 N.Y.U.L.Rev. 1131 (1979). In the case at bar the State presented Dr. Ryals' opin-

ion testimony merely as cumulative evidence, and not as conclusive of sexual intercourse between defendant and his minor daughter. We find nothing in this record to suggest that the jury gave improper weight to his part of the total evidence. The large number of independent systems studied by Dr. Ryals, lifting his estimate of the statistical odds of paternity close to 199 to 1, substantially reduces the risk of misuse of his opinion testimony by a jury properly instructed that it was the one to decide what to believe and how much weight to accord it. *See* Broun & Krause at 179.