MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 24
Docket:        Pen-12-351
Argued:        May 15, 2013
Decided:       February 18, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, GORMAN, and, JABAR, JJ.
Majority:      SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, and GORMAN, JJ.
Dissent:       JABAR, J.

JEFFREY A. COOKSON

v.

STATE OF MAINE

GORMAN, J.

[¶1]    In this third appeal stemming from Jeffrey A. Cookson's 2002 conviction of two counts of intentional or knowing murder, 17-A M.R.S.A. § 201(1)(A) (1983),[1] Cookson challenges a decision of the court (*Cole, J.*) denying, for the second time, his motion for post-conviction DNA analysis of certain evidence.  Cookson contends that the court held him to a higher standard of proof than is required pursuant to the post-conviction DNA statute, 15 M.R.S. §§ 2136-2138 (2010),[2] and that the court erred in finding that Cookson did not establish the requisite elements to obtain such testing.  We affirm the judgment.

---

[1]  Title 17-A M.R.S.A. § 201(1)(A) has since been amended.  P.L. 2001, ch. 383, § 8 (effective Jan. 31, 2003).

[2]  Title 15 M.R.S. § 2138 has since been amended, P.L. 2011, ch. 230, §§ 1-2 (effective Sept. 28, 2011); P.L. 2011, ch. 601, § 13 (effective Aug. 30, 2012); P.L. 2013, ch. 266, § 6 (effective Oct. 9, 2013), but those amendments are not material to this appeal.

2

## I.  BACKGROUND

[¶2]  In 2001, a jury found Cookson guilty of the intentional or knowing murder of Mindy Gould and the young child she was babysitting at the time.[3]  *See* 17-A M.R.S.A. § 207(1)(A).  The court (*Cole, J.*) imposed two consecutive life sentences.

[¶3]  Among the arguments Cookson made in his direct appeal of the judgment of conviction was his contention that the court erred in denying his motion for a new trial on the ground of newly discovered evidence.  *State v. Cookson (Cookson I)*, 2003 ME 136, ¶¶ 7-13, 27-36, 837 A.2d 101; *see* M.R. Crim. P. 33.  We affirmed the judgment after determining that the evidence was not "newly discovered" within the meaning of Rule 33, and that even if it were, it would not have changed the outcome of Cookson's trial.[4]  *Cookson I*, 2003 ME 136, ¶¶ 28-29, 32, 33-34, 837 A.2d 101.

[¶4]  In 2004, and again in 2008, Cookson filed motions seeking post-conviction DNA analysis of some of the evidentiary items that were the subject of his motion for a new trial.  *See* 15 M.R.S. §§ 2137, 2138.  The court denied the motions, and Cookson then commenced a second appeal related to his

---

[3]  The details of the crimes are described in greater detail in *State v. Cookson (Cookson I)*, 2003 ME 136, ¶¶ 2-6, 837 A.2d 101.

[4]  Cookson's sentence review appeal was considered, and affirmed, along with his direct appeal. *Cookson I*, 2003 ME 136, ¶¶ 37-44, 837 A.2d 113.

conviction, which resulted in our decision in *Cookson v. State (Cookson II)*, 2011 ME 53, 17 A.3d 1208; *see* 15 M.R.S. § 2138(6); M.R. App. P. 19.

[¶5]  In *Cookson II*, we interpreted the post-conviction DNA statute, which requires the moving party to present prima facie evidence of five criteria:

> **A.**  A sample of the evidence is available for DNA analysis;
>
> **B.**  The evidence to be tested has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered in a material way;
>
> **C.**  The evidence was not previously subjected to DNA analysis or, if previously analyzed, will be subject to DNA analysis technology that was not available when the person was convicted;
>
> **D.**  The identity of the person as the perpetrator of the crime that resulted in the conviction was at issue during the person's trial; and
>
> **E.**  The evidence sought to be analyzed, or the additional information that the new technology is capable of providing regarding evidence sought to be reanalyzed, is material to the issue of whether the person is the perpetrator of, or accomplice to, the crime that resulted in the conviction.

15 M.R.S. § 2138(4-A); *see* 2011 ME 53, ¶ 7, 17 A.3d 1208.  We also noted that 15 M.R.S. § 2138(5) requires the motion court to issue written findings of fact in granting or denying a request for post-conviction DNA analysis.  *Cookson II*, 2011 ME 53, ¶ 9, 17 A.3d 1208.  Because the court had not made the required findings, we vacated and remanded the matter to the Superior Court for it to do so. *Id.* ¶¶ 9, 18.

4

[¶6] We also clarified one of the five requirements for post-conviction DNA analysis, and the only requirement that was truly in dispute—chain of custody.[5] *Id*. ¶¶ 10-18; *see* 15 M.R.S. § 2138(4-A)(B). We noted that "[t]he central point of the chain of custody requirement is to assure that the evidence is what it purports to be—that is, related to the crime—and that it has not been contaminated or tampered with such that testing of it will yield unreliable (and therefore irrelevant) results." *Cookson II*, 2011 ME 53, ¶ 17, 17 A.3d 1208. We held that a chain of custody consideration must account for any period of time in which the evidence could have been contaminated or tampered with, which in Cookson's case begins with the day of the murders. *Id*. ¶¶ 17-18.

[¶7] On remand, the trial court conducted a second testimonial hearing on Cookson's motion for DNA analysis. By agreement of the parties, the court also considered all of the evidence from the hearing on Cookson's initial motion for a new trial and the first hearing on his post-conviction DNA motion. The extensive findings issued by the court after its consideration of the entire record illustrate the unusual sequence of events preceding Cookson's motion for post-conviction DNA analysis.

[¶8] Before he went to trial for the murders, Cookson was aware that one of his acquaintances, David Vantol, had confessed to the private investigator retained

---

[5] The parties have stipulated to the remaining four requirements in section 2138(4-A). The parties also do not dispute the chain of custody from the time the items came into police possession.

by Cookson's attorney that he, rather than Cookson, had killed the victims. In Vantol's first confession, he asserted that he had killed them in self-defense. Cookson's attorney did not find Vantol's self-defense confession credible. As Cookson's trial was being heard, Cookson's private investigator spoke to Vantol again; Vantol changed his story from one of self-defense to one of murder-for-hire committed at Cookson's request. Cookson and his attorneys were aware of both versions of Vantol's confession. Despite their knowledge of Vantol's revised story, or perhaps because of it, Cookson and his attorneys decided not to call Vantol as a witness during the trial. In addition, they decided not to tell the prosecution or the trial court of either version of Vantol's confession until after the verdict was rendered in Cookson's trial.

[¶9] As a result of these decisions by Cookson, neither the prosecutors nor the investigating Maine State Police detectives were aware of any version of Vantol's confession while the trial was being heard. Rather, it was not until December 6, 2001, after the jury returned its verdict finding Cookson guilty of two counts of murder, that Cookson's attorneys finally notified the prosecutors and the trial court that Vantol was claiming to have been involved in the murders.

[¶10] Detectives immediately met with Vantol. Among the first versions of the story Vantol gave was one—which he later recanted—in which he stated that Cookson approached him in 1999 to kill Gould in exchange for $10,000. Vantol

6

explained that he agreed to Cookson's proposal, and further explained how he carried out his part of the bargain. Vantol stated that on the morning of December 3, 1999, Cookson drove him to a convenience store where Cookson bought him a pair of brown gloves; Cookson then gave Vantol a gun and eventually dropped him off at Gould's home. When Gould answered the door, Vantol followed her into the home and shot her. Vantol explained that he shot the child just because the child was present.

[¶11] To corroborate his confession, Vantol offered to provide the detectives with the gun he used to commit the murders and the clothing he wore at the time of the murders; he first claimed to have been wearing sneakers, flannel pants, a flannel jacket, an Adidas hat, and the brown gloves, but later claimed he wore jeans, a t-shirt, and a flannel shirt along with the sneakers and gloves. Vantol stated that he had buried those items, as well as the gun[6] and a wig that Cookson wore that day, on property owned by Scott Cookson, Cookson's brother.

[¶12] That very night, December 6, 2001, Vantol led detectives to a location in the woods on Scott Cookson's property where he quickly unearthed a gun that turned out to be the murder weapon. *See Cookson II*, 2011 ME 53, ¶ 3, 17 A.3d 1208; *Cookson I,* 2003 ME 136, ¶ 9, 837 A.2d 101. Vantol repeatedly refused to lead the detectives to where the other items were buried, but two days later, on

---

[6] Vantol claimed that he subsequently moved the gun in case he needed it.

December 8, 2001, he did provide them with a green plastic trash bag containing various items of clothing that he stated he had dug up on Scott Cookson's property. The bag contained only a pair of blue sneakers, a size XL jean jacket with pink stains that appeared to be bleach stains, a plaid flannel insulated shirt, a black wig, and a fluorescent orange knit hat. The police noted that the items were "very wet and brittle" and had roots and grass mixed in.

[¶13] Vantol, who has limited cognitive functioning, was admitted to Acadia Hospital soon afterward. After being treated at the hospital, Vantol recanted his earlier confessions and informed the detectives that he had not been involved with the murders, had pulled the clothing items out of a junk car, and knew where the gun was based on Cookson's directions. Vantol stated that he had fabricated his involvement with the murders at Cookson's specific request.

[¶14] Cookson is now attempting to obtain post-conviction DNA testing of the clothing that Vantol gave the detectives in 2001. On remand, the trial court concluded that Cookson failed to present his prima facie evidence that the clothing had not been substituted, tampered with, replaced, or altered between the time of the murders and the time Vantol gave the items to the police, for two reasons. First, the court found that there was a two-year gap in the chain of custody in that Cookson offered no evidence "as to the condition and circumstances that existed at the Scott Cookson trailer and junkyard [from] the date of the homicides on

December 3, 1999[,] to the time David Vantol turned over the items to [detectives] on December 8, 2001." The court referenced evidence showing that law enforcement officers searched the "large area of woods and open area" that comprised the junkyard on December 17, 1999, which included a video of "[h]eavy equipment . . . shown moving large metal items and junked cars over a considerable area," suggesting that items in the junkyard might have been moved in the intervening years.

[¶15] Second, the court found that there was "very little, if any, evidence that the clothes and sneakers have not been substituted, tampered with, replaced or altered in any way," particularly given that when Vantol turned the items over to the police, the clothing clearly was not in the same condition as when it was last worn. On these two grounds, the court denied Cookson's motion for post-conviction DNA testing a second time. Cookson filed this third appeal. *See* 15 M.R.S. § 2138(6); M.R. App. P. 19.

## II. DISCUSSION

[¶16] Cookson now challenges the court's finding that he had not presented the required prima facie evidence as to the chain of custody. We defined prima facie evidence, as used in the post-conviction DNA statute, in *Cookson II*:

> Prima facie in this context regards the preliminary burden of production of evidence; it requires proof only of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor. Prima facie evidence requires only some evidence on every

element of proof necessary to obtain the desired remedy. Thus, prima facie proof is a low standard that does not depend on the reliability or credibility of the evidence, all of which may be considered at some later time in the process.

2011 ME 53, ¶ 8, 17 A.3d 1208 (footnotes omitted) (citations omitted) (quotation marks omitted). Notwithstanding this low evidentiary burden, we will disturb the court's determination that Cookson failed to carry his burden only if "the evidence compelled the court to find to the contrary." *Laferriere v. State*, 1997 ME 169, ¶ 6, 697 A.2d 1301 (quotation marks omitted).

[¶17] The trial court's first ground for denying Cookson's motion—that Cookson failed to account, even on a prima facie basis, for the location of or circumstances surrounding the clothing during the two years between the murders and the time Vantol gave detectives the trash bag—is amply supported by the record. Even when considering the evidence from the 2002 hearing on Cookson's motion for a new trial, during which Vantol testified, in addition to the evidence from the first hearing on Cookson's motion for DNA analysis, there simply was no testimony from any source at any stage of the proceeding suggesting that Vantol ever said that the clothes remained where he buried them during the two years between the murders and his confessions, nor any evidence on which to base a reasonable inference of that fact.[7]

---

[7] As mentioned earlier, in one version of his story, Vantol himself unearthed the evidence to retrieve and remove the gun he had initially buried with the clothing.

10

[¶18]   The court's second ground for denying the motion—that there was little or no evidence that the clothing items had not been substituted, tampered with, replaced, or altered, particularly given that when Vantol turned the items over to the police, the clothing clearly was not in the same condition as when it was last worn—is also supported by the record.  The record contains no evidence that Vantol ever stated that he knew or believed that no one had tampered with the clothes since they were buried.  The junkyard area was, as the court noted, a "large area of woods and open area" and, on at least one occasion during the two-year period in question, the area was disrupted by heavy earth-moving equipment.  Vantol was not the owner of the property where he said the clothing was buried, and had no control over what happened on or to the property.

[¶19]   Also essential to this portion of the analysis are the significant differences between the clothing Vantol described and the clothing he turned over to detectives.  Most importantly, the clothing Vantol turned over did not include two specific items of clothing that he told the detectives he had worn and buried, that is, the jeans and the gloves.  The court also found that the sneakers were in better condition than the clothes, that the clothing would not fit Vantol, and that the clothing was not similar to the type of clothing Vantol was ever seen wearing.  Leaving aside Vantol's later recantations, and independent of Vantol's level of credibility given his ever-changing story, the clothing he turned over in 2001 does

not even grossly match the clothing he said he had worn while committing the murders. Given these marked inconsistencies, we cannot say that the post-conviction court erred in determining that the clothing was not in the "same condition" as when it was last said to be worn, even when applying the low prima facie standard.[8]

[¶20] The point of establishing a chain of custody is to demonstrate that the evidence presented for testing is evidence that is germane to the case, and that it has not been tampered with. *Cookson II*, 2011 ME 53, ¶ 17, 17 A.3d 1208. Here, the evidence presented in support of Cookson's petition demonstrated that the bag of clothing Vantol produced contained fewer than all of the items he had promised, and that it had been obtained from a site owned by Cookson's brother after a two-year period during which Cookson was unable to account for its location or condition at all. Given the state of the record, the post-conviction court was not compelled to find that Cookson had established, on a prima facie basis, that the clothing was related to the murders and that it had not been moved or tampered with during the two years between the murders and the time the clothing was produced. Thus, the trial court did not err in determining that Cookson failed to

---

[8] The court also found that the items were "degraded, soiled, and had organic material attached to them." Such a finding alone, however, will not support a determination that the clothing was in a different condition than on the day of the murders.

12

establish the chain of custody necessary to obtain an order for post-conviction DNA analysis.

The entry is:

Judgment affirmed.

---

JABAR, J., dissenting.

[¶21]  I respectfully dissent because I believe that the post-conviction court erred in concluding that Cookson failed to produce prima facie evidence of a sufficient chain of custody to permit DNA testing.  Moreover, I believe that the trial court erred as a matter of law in requiring him to "eliminate all possibility of tampering with the exhibit involved."  *State v. Thibodeau*, 353 A.2d 595, 603 (Me. 1976); *see also* 15 M.R.S. § 2138(4-A)(B) (2010).[9]

[¶22]  In affirming the post-conviction court's denial of Cookson's petition to conduct DNA testing, the Court defers to the trial court's conclusion that Cookson failed to meet his burden to produce prima facie evidence of a chain of custody based on two of the court's findings: (1) "[t]here exists a [two]-year gap of the items before they were turned over to the police and there has been no proof

---

[9]  Although 15 M.R.S. § 2138(4-A)(B) is unchanged as a result of the Legislature's 2011 and 2013 amendments to the post-conviction DNA analysis statute, *see* Court's Opinion ¶ 1 n.2, I cite to the 2010 version in order to clarify that I am referring to the same version of section 2138 to which the Court refers.  Court's Opinion ¶ 1.

presented that any of the items are in the same condition [as] when the crime occurred or that they have not been tampered with"; and (2) Cookson "presented very little, if any, evidence that the clothes and sneakers have not been substituted, tampered with, replaced[,] or altered in any way." *See* 15 M.R.S. § 2138(4-A)(B); Court's Opinion ¶¶ 17-18. However, with this interpretation of section 2138(4-A)(B), the post-conviction court has required Cookson to prove a negative. In other words, although Vantol informed police that he wore the clothes in question during the homicides, buried them following the murders, and retrieved them to turn over to the police, the court nonetheless required Cookson to prove that the items were not "substituted, tampered with, replaced or altered in any material way," during the two years that they were buried. 15 M.R.S. § 2138(4-A)(B). This places an impossible burden on any person seeking DNA analysis, and the Court's interpretation is an illogical reading of the post-conviction DNA analysis statute.

[¶23] Title 15 M.R.S. § 2138(4-A) requires the proponent of DNA testing to present prima facie evidence of the following elements:

A. A sample of the evidence is available for DNA analysis;

B. The evidence to be tested has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered in a material way;

C. The evidence was not previously subjected to DNA analysis . . . ;

14

    D.    The identity of the person as the perpetrator of the crime that resulted in the conviction was at issue during the person's trial; and

    E.    The evidence sought to be analyzed . . . is material to the issue of whether the person is the perpetrator of, or accomplice to, the crime that resulted in the conviction.

The State and Cookson stipulated that elements A, C, D, and E were established. Therefore, the only element at issue is whether Cookson presented prima facie evidence that "[t]he evidence to be tested has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered in a material way." *Id.* § 2138(4-A)(B).

A.    Prima Facie Evidence

[¶24]  The prima facie evidence standard "regards the preliminary burden of production of evidence; it requires proof only of 'enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor.'" *Cookson v. State* (*Cookson II*), 2011 ME 53, ¶ 8, 17 A.3d 1208 (quoting *Anderson v. Delaware*, 831 A.2d 858, 865-66 (Del. 2003)). "Prima facie evidence means evidence that, if unrebutted or unexplained, is sufficient to maintain the proposition." *Town of Blue Hill v. Leighton*, 2011 ME 103, ¶ 12 n.5, 30 A.3d 848 (quotation marks omitted); *see also State v. Beane*, 146 Me. 328, 331, 81 A.2d 924 (1951). Stated differently, prima facie evidence "requires only some evidence on every element of

proof necessary to obtain the desired remedy." *Cookson II*, 2011 ME 53, ¶ 8, 17 A.3d 1208 (quotation marks omitted).

[¶25] Because the statute requires the defendant to produce only prima facie evidence, he meets this burden if he provides "some evidence" on every element necessary to prove chain of custody. *Id.* Unlike in the context of a trial, in which one party presents prima facie evidence that the opposing party may rebut with other evidence, here, the defendant's burden ends when he provides evidence "to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Id.* (quotation marks omitted). "Thus, prima facie proof is a low standard that does not depend on the reliability or credibility of the evidence, all of which may be considered at some later time in the process." *Id.* (quotation marks omitted). As a result, the post-conviction court's factual findings are not at issue. *Cf.* Court's Opinion ¶ 16.

[¶26] Rather, the sole issue presented to us on appeal is whether Cookson has presented sufficient prima facie evidence of the chain of custody. Because the reliability and credibility of the evidence are not at issue, whether Cookson has presented sufficient evidence to meet every element of the chain of custody is ultimately a legal question. *See State v. Ntim*, 2013 ME 80, ¶ 9, 76 A.3d 370 ("If [a court's judgment] is based primarily on undisputed facts, it is viewed as a legal conclusion that is reviewed de novo."). On appeal, Cookson argues that the

16

post-conviction court erred in making a legal determination: interpreting section 2138(4-A)(B) to require that he provide evidence to convince the court that there was an absence of any tampering or alteration during the entire period in question.

B.    Chain of Custody

[¶27]  The requirement that Cookson demonstrate a chain of custody refers to the need to "support a finding that the [item of evidence] in question is what its proponent claims." *Cookson II*, 2011 ME 53, ¶ 11, 17 A.3d 1208 (quotation marks omitted).  We have stated that "[t]he purpose of the chain of custody . . . rule is, of course, to vouchsafe assurance that the exhibit has not been altered or tampered with and that there has been no substitution." *Thibodeau*, 353 A.2d at 602-03.  Our cases make clear that the party seeking to introduce evidence "is not required to exclude every possibility of these occurrences, nor to show that some credible witness retained the exhibit in his personal possession or under constant watch." *Id.* at 603 (quotation marks and alterations omitted).  Similarly, we have never held that for evidence to meet a chain-of-custody requirement and be admissible at trial, the proponent must demonstrate that the evidence was not tampered with or altered at any moment while in the State's custody.  *See, e.g., State v. Thompson*, 503 A.2d 689, 691 (Me. 1986).

[¶28]  Rather, an item of evidence is admissible at trial if the party seeking to introduce that evidence can demonstrate "by the fair preponderance of the

evidence . . . that it is more probable than not that the object is the one connected with the case." *Id.*; *see also Thibodeau*, 353 A.2d at 603. "'Evidence which provides a reasonable assurance that the exhibit is the same and in the same condition meets the test.'" *Thibodeau*, 353 A.2d at 603 (quoting *State v. Cress*, 344 A.2d 57, 61 (Me. 1975)).

[¶29]  Specifically with regard to items that are "readily identifiable by distinguishing features or hardly subject to change," the party seeking to offer that evidence need not provide evidence of the same "safeguards necessary to preserve the integrity of real evidence of a fungible or volatile nature which may be easily destroyed by natural or other forces." *Id.* For example, a physical item with readily identifiable physical characteristics, like a coffee pot, need not be authenticated through the rigorous continuity-of-possession requirements that are necessary to support the admissibility of fungible evidence, like narcotics or money. *Id.* For this reason, we have stated, "Among the factors that the trial court should consider when the chain of custody is not demonstrated to be complete and exclusive are the nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it." *State v. Lewis*, 401 A.2d 645, 647 (Me. 1979); *see also United States v. De LaRosa*, 450 F.2d 1057, 1068-69 (3d Cir. 1971) (holding that because the clothing introduced by the Government matched imprints of that clothing at the

crime scene, the Government was not required to prove that clothing was in the same condition when introduced as at the time of the crime).

[¶30]  Here, the post-conviction court cites two substantial reasons in its decision to support its conclusion that, based on the evidence in the record, Cookson failed to meet his burden with regard to section 2138(4-A)(B).

1.    Evidence of an Absence of Tampering

[¶31]  In its decision, the post-conviction court notes, "[T]here exists a [two]-year gap of the items before they were turned over to the police and there has been no proof presented that any of the items are in the same condition when the crime occurred or that they have not been tampered with."  Additionally, the post-conviction court found that Cookson "presented very little, if any, evidence that the clothes and sneakers have not been substituted, tampered with, replaced[,] or altered in any way."  The Court defers to this finding, confirming that "there simply was no testimony from any source at any stage of the proceeding suggesting that Vantol ever said that the clothes remained where he buried them during the two years between the murders and his confessions."  Court's Opinion ¶ 17.

[¶32]  However, this decision erroneously applies our law on chain of custody for two reasons.  First, our cases make clear that a chain of custody does not require that the party seeking to introduce the evidence negate every possibility

of tampering or that "some credible witness retained the exhibit . . . under constant watch." *Thibodeau*, 353 A.2d at 603. Unlike in *Thibodeau*, where the court was admitting evidence in the context of a trial, here Cookson has a lower burden: to produce only prima facie evidence of a chain of custody. *See* 15 M.R.S. § 2138(4-A)(B).

[¶33] Second, the State has *stipulated* that the clothing "is material to the issue of whether the person is the perpetrator of, or accomplice to, the crime that resulted in the conviction." *See* 15 M.R.S. § 2138(4-A)(E). Because of this stipulation, there is no question that the clothing retrieved by Vantol is the clothing that may contain evidence related to the murders. As a result, the court need not determine whether it is "more probable than not that the object is the one connected with the case," *Thompson*, 503 A.2d at 691; *see also Cookson II*, 2011 ME 53, ¶ 11, 17 A.3d 1208.

[¶34] Even if the parties had not stipulated that the clothing is material to the identity of the perpetrator, the clothing is readily identifiable and is not fungible—meaning that, unlike drugs or money, it cannot easily be replaced with similar items—and, thus, we do not require the person seeking to introduce this evidence to provide evidence of its continued possession for the entire relevant period. *See Lewis*, 401 A.2d at 647; *Thibodeau*, 353 A.2d at 603. Continuity of possession by either Cookson or Vantol is unnecessary and irrelevant pursuant to

our case law on chain of custody, and the court erred in requiring Cookson to provide evidence that the clothes were not tampered with or altered from the time of the murders until he gave them to the police. *See Thompson*, 503 A.2d at 691; *Lewis*, 401 A.2d at 647; *Thibodeau*, 353 A.2d at 603; *see also De LaRosa*, 450 F.2d at 1068.

[¶35] Vantol told detectives that the clothes he retrieved were the same as those that he wore during the murders and that he buried shortly after committing the homicides. By presenting evidence that the clothes were buried in a rural location in the Maine woods and then dug up later, the fact-finder may certainly *infer* "that the evidence has not been substituted, tampered with, replaced or altered in a material way." *See* 15 M.R.S. § 2138(4-A)(B). Despite the fact that, here, the statute requires only prima facie evidence—a lower standard than that required in the context of a trial, *see Thompson*, 503 A.2d at 691—the Court attempts to heighten the requisite standard for chain of custody in the context of DNA testing. By affirming the decision of the trial court, the Court adopts a standard under which proponents, who at one point possessed items that they wish to submit for DNA analysis, must "eliminate all possibility of tampering with the exhibit involved," thus demanding a condition that we have never before required. *Thibodeau*, 353 A.2d at 603.

2.     Changed Condition

[¶36]  The post-conviction court also found that "clearly [the clothes] were not in the same condition [as] when they were last worn," and that they were "not in substantially the same condition as when the crime was committed."  The Court again defers to this finding, stating, "[T]he clothing [Vantol] turned over [to police] in 2001 does not even grossly match the clothing he said he had worn while committing the murders."  Court's Opinion ¶ 19.  However, Vantol admitted that these were the clothes that he was wearing during the homicides.  Because prima facie evidence does not depend on the credibility of the evidence, *Cookson II*, 2011 ME 53, ¶ 8, 17 A.3d 1208, the court must infer that these were the same clothes worn during the homicides.  Again, Cookson does not dispute the court's finding that the clothing is degraded, but argues that it is irrelevant for determining whether there is prima facie evidence of a chain of custody.

[¶37]  At this stage, section 2138(4-A)(B) does not require Cookson to show that the evidence on the clothing is not degraded.  The testing may demonstrate that the evidence on the clothing had deteriorated to the point that DNA analysis is impossible.  However, if the evidence on the clothing has not deteriorated, then testing may be performed to determine whether the clothing contains any DNA from the victims, Vantol, or Cookson.  Without the technology for extracting a testable sample from the clothing and absent scientific knowledge about the testing

requirements, Cookson is wholly unable to meet this burden. Only the DNA analysis will reveal whether there is any evidence on the clothing that can be tested, and thus, the court's interpretation of section 2138(4-A)(B) is an unreasonable and illogical construction of the DNA analysis statute. *See State v. Aboda*, 2010 ME 125, ¶ 10, 8 A.3d 719 (stating that in construing a statute "[w]e seek to . . . avoid[] results that are absurd, inconsistent, unreasonable, or illogical." (quotation marks omitted)).

C.    Conclusion

[¶38]    Unless we permit the testing, we will never know whether the evidence is inconclusive, inculpatory or exculpatory. The analysis may confirm that the evidence on the clothing had deteriorated to the point that DNA analysis is impossible. However, if the clothing has not deteriorated, then testing may be performed to determine whether there is DNA from the victims, Vantol, or Cookson. If any of the victims' DNA is found on any of the clothing, then it is clear that the clothes were connected with the homicide. If testing further reveals that Cookson's DNA is present on the clothing, Cookson will have an impossible task of convincing a judge that he is entitled to any relief under the statute. On the other hand, if Vantol's DNA is found on the clothing along with the victims' DNA, to the exclusion of Cookson's DNA, then Cookson would have a strong argument

to make for relief pursuant to the statute.[10] *See generally* 15 M.R.S. § 2138(10) (2013).

[¶39] DNA analysis has had a dramatic impact on justice in this country. Not only has it vindicated some defendants who have been wrongfully convicted, but it has also been used by law enforcement to reopen old cases and convict defendants of crimes that had previously gone unsolved. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55 (2009) (recognizing the "unparalleled" power of DNA evidence to "exonerate the wrongly convicted and to identify the guilty"). It is incumbent on the state, in its judicial, investigative, and prosecutorial capacities, to use this "unparalleled" evidence where it is available.

[¶40] In this case, because the prima facie standard requires only "some evidence" of chain of custody, and the chain of custody for these items does not require the party seeking to introduce the evidence to negate every possibility of tampering, *see Thibodeau*, 353 A.2d at 603, the court made an error of law in concluding that Cookson did not satisfy the requirements of 15 M.R.S. § 2138(4-A)(B). Therefore, the Court's decision affirming the denial of DNA

---

[10] Among the evidence in the record that might support Cookson's argument for relief is the following: (1) Cookson's conviction was based on circumstantial evidence; (2) Vantol confessed to the murders on at least five separate occasions; (3) despite having the developmental capacity of a twelve-year-old, Vantol recounted intricate details of the murders and the scene of the crime; (4) Vantol provided the police with a gun that later proved to be a ballistics match to the murder weapon, although during Cookson's trial the State provided evidence of a different weapon that it alleged Cookson had used; and (5) the mother of Vantol's child testified that the clothing was similar to the type of clothing worn by Vantol around the time of the murders.

testing is contrary to the requirements of the DNA analysis statute, our decision in *Cookson II*, 2011 ME 53, ¶¶ 8-9, 17 A.3d 1208, and our precedent concerning chain of custody, *see Thompson*, 503 A.2d at 691; *Thibodeau*, 353 A.2d at 603. I would vacate the trial court's decision and remand for further proceedings.

---

**On the briefs:**

Richard L. Hartley, Esq., Law Office of Richard L. Hartley, P.C., Bangor, for appellant Jeffrey Cookson

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee State of Maine

**At Oral Argument:**

Richard L. Hartley, Esq., for appellant Jeffrey Cookson

Donald W. Macomber, Asst. Atty. Gen., for appellee State of Maine

Penobscot County Superior Court docket numbers CR-2000-11 and CR-2004-1043
FOR CLERK REFERENCE ONLY